**Opinion issued February 13, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00303-CR

————————————

## JONATHAN D. CANFIELD, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

### On Appeal from the 338th District Court
### Harris County, Texas
### Trial Court Case No. 1216717

---

## O P I N I O N

This is a capital-murder case. Appellant Jonathan Canfield was convicted by a jury and sentenced by the trial court to life imprisonment. We affirm the trial court's judgment.

## THE EVIDENCE

Appellant's former uncle by marriage, Mario Towns, was shot and killed by William Garret (known as "Plug"), one of appellant's friends. Appellant was charged and convicted of capital murder as a co-conspirator or party. Several fact witnesses testified at trial, giving a fairly consistent account of the parties' relationships, the surrounding events, and the motive for the robbery that led to the murder.

### A. Background

Both the appellant and the deceased, Mario, lived in Monroe, Louisiana. Mario and his wife, Nicole Towns, lived in a house with their two children, their six children from prior relationships, and one of Mario's nephews. Nicole and Mario owned an urban clothing store called "Sugar's Boutique," which Nicole primarily ran. Appellant is the nephew of Mario's ex-wife, Wynell. Appellant would often stay at Mario's house because he was close with Mario's oldest son, and because Mario was like a father figure to appellant. Mario and appellant always had a good relationship until a March 2009 dispute over money.

Mario, along with several of his family members, ran a marihuana-trafficking enterprise. Because marihuana was cheaper in Houston, Mario and others would frequently travel to Houston to purchase marihuana, and then transport it to Monroe, Ohio, or Atlanta to sell. Several family members would

2

pool their money for these trips, and receive a return based on the percentage contributed. On some trips, they took as little as $3,000, and other trips they took as much as $50,000–$60,000 to spend. Generally, they could expect to double their money.

Usually these purchasing trips were done with some combination of Mario, John Town (Mario's nephew), and Chris Harris (Mario's son). A few times, appellant participated in these runs. Other people unrelated to the drug trafficking also joined them at times, including Nicole Townes,[1] Mario's girlfriend.

They often stayed at a house in Houston on Dulcimer Street with appellant's uncle, Roosevelt Canfield (known by his nickname, "Perney"). That house was owned by Perney's girlfriend's mom, but Perney's girlfriend had her own place in Fresno. Perney would sometimes stay in Fresno at his girlfriend's while guests were at the Dulcimer house; other times he would stay with his guests to socialize, go clubbing, etc. He was aware about some of Mario's drug activities, but not involved in them.

Appellant and Perney were very close. For one year in high school, appellant lived with Perney in Houston at a different house.

**A. The March 2009 Loss**

---

[1] Nicole Townes is not related to Mario's wife, Nicole Towns.

John and Chris testified that, around March 17, 2009, they went to Houston to purchase marihuana. They had a total of $23,000 with them. They both testified that appellant had contributed $5,000 to that amount, and the rest was contributed by Mario, John, and Chris. John and Chris did not find marihuana in the quality they liked by March 20, 2009, and decided to head back because John's birthday was that day and he wanted to celebrate at home in Monroe.

The money was hidden in the truck under the spare tire of their car, and they had two guns in the center console. They were pulled over by police in Nacogdoches, Texas. The police searched the car, found the money and guns, impounded the car, and took Chris and John to jail. They testified that, after about three hours, they were pulled out of their cell and presented with a deal: the police would let them go and not say anything about the guns if they would give up any claim to their money. They agreed, retrieved their vehicle from the impound yard, and headed home.

They called Mario, who was angry that they had left Houston empty-handed without telling him first. When they explained what had happened with their arrest, he told them to just come home to Monroe. They later called appellant, who was angry and did not believe their story. John said appellant seemed to believe them after they saw him in person and showed him paperwork related to their arrest. Nonetheless, John said appellant still blamed them "somewhat" for the

4

loss of his $5,000. John testified that he and appellant later argued over the lost money.

Chris likewise testified that his relationship "starting getting rocky" with appellant after that. He had three or four conversations with appellant in which appellant complained about the loss of his money. He also heard about appellant and Mario fighting about this lost money.

Mario's wife Nicole testified that she had always perceived Mario and appellant to have had a good relationship until she witnessed an altercation between them in the parking lot of her clothing store around April 1, 2009. Mario and appellant got in a heated argument over some money that appellant "felt Mario owed to him." After appellant left, Mario came into the store and told her to call the police because appellant had just threatened him. Ultimately, she did not call because Mario also left the store. After that fight, appellant did not come around their house or store as he normally would. Appellant called Nicole at one point to ask if she knew about some money that was supposed to be returned to him that Mario owed him and she told him that she did not.

**B. The May 16, 2009 Shooting**

On Wednesday May 13, 2009, appellant called his friend Lashaka in Houston to let her know that he was coming to town the next day and that something bad was about to happen. Her understanding was that there was

5

something wrong, but appellant did not answer her follow-up questions about what he meant. Appellant testified that the next day—May 14, 2009—he came to Houston to buy drugs. He testified that he got a late start out of Monroe and was tired, so he called his friend Plug to ride with him so they could share driving responsibilities. They went first to Lashaka's house, where they hung out for a while and then decided to go to a strip club. He and Plug took Lashaka's brother, Perry Lowe (known as P-A). P-A and appellant had been friends since meeting in appellant's ninth-grade-year at Bellaire High School when he previously lived with Parney in Houston.

Before going to the club, they stopped at the Dulcimer house to let Perney know that they would be staying there. Perney testified that he was not expecting them, as appellant had not called to let him know he would be in town. Perney already knew P-A as a friend of appellant's, but had never before met Plug. Perney was on his way out of the house, but left them a key and went to his girlfriend's house in Fresno for the night.

The next day, Friday, Perney stopped by the Dulcimer house to get ready for work and got the impression that appellant and his friends were leaving that evening, so he gave them instructions about how to lock up. After work, Perney went back to his girlfriend's house in Fresno for the night without going back by the Dulcimer house.

It is in the recitation of the events of the next day—Saturday, May 16, 2009—in Houston that there is some divergence between appellant's and the other witnesses' version of events. On the morning of May 16, Mario, Mario's girlfriend Nicole, Chris, and Tracey Davis (Chris's uncle, known as "Trey") returned to Monroe from three days in Ohio. Mario then decided then that they should go to Houston.

After just a couple of hours in Monroe, Mario, his girlfriend Nicole, Chris, John, Trey, and Mike Davis (Mario's cousin) headed out to Houston in two vehicles, a Ford F150 and a Lincoln Navigator. Although the purpose of the trip was to buy marihuana, Trey and Mike were not involved in trafficking, but instead were along for the ride to do some clubbing and shopping. Each person who was coming to buy drugs was carrying his own money. John, Nicole, and Chris each testified that Mario had $7,000 in his lower right cargo shorts pocket. Chris had $3,000 and John had $1,600. Mario called Perney to let him know that they were coming and would be staying at the Dulcimer house. No one who testified at trial had talked to appellant or told appellant that they were traveling to Houston.

Unbeknownst to Perney, appellant and his friends had not left Houston on Friday. Rather, according to appellant's testimony, they stayed longer because he had been unable to accomplish the drug transaction he wanted to complete. While waiting at the house for his deal to come together, appellant decided on Saturday to

7

have Lashaka and her friend pick up his car to take it to a mechanic she knows to troubleshoot a problem he had been having. As a result, there was no car outside of the Dulcimer house on Saturday afternoon to indicate that appellant, Plug, and P-A were there.

Mario arrived Saturday afternoon at the Dulcimer house in the Lincoln Navigator with Nicole, Mike, and John. Because it appeared from the outside of the house that no one was home, they waited for a few minutes outside. Mario then called Perney, who said he would be there in 25–30 minutes. Mario decided they should head over to an urban clothing store nearby to kill some time.

Chris and Trey pulled up a few minutes later in the F150 and likewise assumed that no one was in the house. They headed to the same clothing store.

In the meantime, before Mario's group made it back by, Perney stopped by the Dulcimer house to leave a key for Mario outside. When he got there, he decided to go in to the bathroom. He thought the house was empty but, when he walked out of the bathroom, he was hit hard in the face and fell down. He looked up from the floor saw Plug standing over him with a shotgun pointed at him, and appellant standing next to Plug with a pistol down to his side. P-A was hovering somewhere in the background. Perney jumped up; appellant was telling Perney to "calm down, calm down," while Plug was saying, "tie him up." Perney testified that appellant, Plug, and P-A had their faces partially covered at one point with t-

8

shirts, rags, or some kind of mask, but that their faces were fully visible to him during most of the confrontation.

Perney testified that appellant and Plug started asking whether Mario was with him and "Where is Mario?" Perney told them, "Mario is not with me. I don't know where Mario is." Perney was agitated at this point and began yelling, "what . . . is going on? I'm your uncle. You are my nephew. What's all this about?" Appellant continued trying to calm him down and at some point says, "Let him go." Perney went outside, jumped in his vehicle, and quickly sped away. As Perney was pulling away, he called his mother. He did not see any vehicles pulling up to the house as he was leaving. After hanging up with his mother, Perney immediately called 911 to report "being accosted" at the house, and then drove to Fresno. He did not call Mario to tell him what had happened.

Nicole, Mike, and John testified that they saw Perney driving away quickly from the house as they were returning to the house from the clothing store. When they could not get his attention, Mario tried to call him, but the call went straight to Perney's voicemail. The iron gate in front of the front door appeared open, so Mario and Nicole got out of the Navigator to go inside. Before Mike and John could also get out, Mario told them to run down to the corner convenience store for cigarillos.

9

Nicole testified that they walked in the front door and Mario headed straight for the bathroom in Perney's bedroom. She dropped her purse onto the floor in the living room, and followed Mario into the bathroom to talk to him. When she turned back around and was walking out, she noticed someone run out of the bedroom closet. Then someone ran into the living room behind her, told her to get down onto the ground, and pressed something hard into her back that she assumed was a gun. She heard two other people come downstairs and go into the bathroom with Mario. She could not tell who remained in the room with her, in part because the top and bottom of his face was covered with a shirt, with only his eyes showing. She heard a commotion in the bathroom, and then a gunshot.[2]

The other two men immediately came out of the bathroom and into the living room. They also had shirts around their faces; one was holding a shotgun and the other a pistol. They were all asking her "where the money was" and whether she had any money. She took what money was in her purse and threw it at them. The bottom of one of their shirts came off and she recognized him as appellant, whom she had known since middle school. Appellant looked at her and said, "Duct tape that bitch." One of the men taped her hands behind her back while appellant and the other man ran out of the house. Nicole was left alone for a

---

[2]     On cross-examination she was asked about making the statement to police that she overheard someone in the bathroom say, "Don't shoot my family." She testified at trial that she recalled hearing someone in the bathroom say, "You are supposed to be my family."

few minutes with the one who had taped her hands, and then he finally shut her inside the living room closet.

In the closet, she managed to remove the tape and, when the house was quiet, she came out and ran to the bathroom. She found Mario on the floor "with his face blown open." She called John who was still at the store down the street, where Chris and Trey had just met up with him and Mike. John testified that Nicole was "hollering and crying, saying 'They shot him." John asked "Who?" and she responded, "Jonathan and them." John, Mike, Chris, and Trey raced back to the house, where they found Nicole screaming and Mario leaning over the sink moaning. The flap to his right bottom pocket on his cargo shorts was open, and the $7,000 was gone.

John told Nicole to call 911, but they did not know the exact address so they loaded up Mario in the backseat of the F150 and set off to find a hospital. They spotted and flagged down Officer Magnum with the Houston Police Department (HPD), who escorted them to the hospital where Mario died a few hours later. The cause of death was a single shotgun blast to the face at close range.

## C. The Investigation

Officer Hubenak with HPD testified that, right about the time Officer Magnum was being flagged down, he was responding to a call about the gunshot at the Dulcimer house. When he arrived, the front door was open. He found a shirt

11

drenched in blood inside the door, and a large amount of blood and flesh in the downstairs bathroom. While Hubenak was waiting for homicide investigators, Perney showed up. Perney told Hubenak that earlier in the evening he had been involved in an argument with his nephew and some of his friends who were wearing masks and had pistols. Tests for gunshot residue on Perney were negative.

In the bathroom, investigators recovered a plastic wad expelled from a shotgun shell, along with the pellets and gunpower. They also recovered Mario's wallet containing his driver's license, an empty cell phone holster, and a kitchen knife on the floor by the toilet.[3] Later, investigators returned and recovered the shotgun from under the couch, a roll of tape, and a crumpled up piece of used packing tape from the closet in which Nicole claimed she had been placed.

The investigating officer testified that Perney was initially considered a suspect, but was later eliminated. After interviewing all the witnesses—including all those who had traveled to Houston with Mario[4]—the suspects were appellant, Plug, and P-A. After a warrant was issued for appellant's arrest, appellant came to the Houston to give a statement. Plug gave a confession to officers in Monroe, but

---

[3]    The knife contained traces of Mario's DNA, as did most things in the bathroom. The knife did not contain fingerprints matching Mario, appellant, Plug, or P-A.

[4]    The witnesses gave fairly consistent accounts of the facts, but were not initially forthcoming about the real reason for traveling to Houston. Before admitting that they were there to purchase drugs, they claimed that they were carrying large amounts of cash to purchase clothing inventory for Mario's wife, Nicole, to stock in her store.

12

the record does not reflect the specifics of that confession. The record also reflects that P-A was interviewed by police, but contains no information about what he told them or what, if anything, he was charged with. Neither Plug nor P-A testified at appellant's trial.

### D.    Appellant's Testimony

Appellant's testimony differed as to some specifics of the events leading up to the shooting. He testified that, at one point on Saturday, he was upstairs at the Dulcimer house and saw two vehicles pull up—a Lincoln Navigator and an F150. He did not recognize the Navigator, but when he saw the other truck, "he knew it was Mario and them." He never actually saw Mario, but he saw others get out of the F150. By the time he got downstairs, they were gone. He assumed that they had found the front door locked and then left.

A short time later, he claimed he was "involved in an accident with Plug and [his] uncle." Appellant was upstairs again and heard a commotion downstairs. When he ran downstairs, he saw Plug "over the top of" Perney. Appellant asked "what's going on" and told Plug to "[l]et him up." Perney, who was visibly "nervous and shaking," quickly left despite appellant's calling his name and trying to stop him.

A few minutes later, he saw the Navigator pull up out front and Mario and his girlfriend Nicole get out and walk towards the house. Appellant stated that he

did not see where they went when they came into the house, and that he did not know where Plug or P-A were at that time. When appellant came out of the kitchen, he saw Nicole and Plug go running towards the front door, and he saw Mario in the doorway to the downstairs bathroom. Appellant testified that he was the only one approaching Mario, and that he had a gun in his pocket and a knife in his hand. He explained that he had the handgun "for protection . . . because [Mario] usually carr[ies] a gun, and I'm going to approach him about my money." He had the knife because he was "going to approach Mario with the knife instead of the gun." He confronted Mario and they got into an argument. He demanded his money and claimed Mario responded, "Man, I told you I was going to give you your money." At one point, appellant claimed he "had enough of it," threw down the knife, and walked out of the bathroom.

According to appellant, Plug ran past him into the bathroom towards Mario and then appellant heard a gunshot behind him. He ran back into the bathroom where Mario was shot and started asking Plug, "Man, why did you shoot my uncle" to which Plug responded, "I didn't try to. I dropped it." Appellant was nervous and ran out the front door with P-A in tow. Plug caught up with them down the street a few minutes later. Appellant tried to call Perney, but his call went straight to voicemail. He then called one of his friends, Johno, to come pick the three of them up.

14

Appellant claimed that he did not see Plug shoot Mario and that he did not take any money off of Mario's body. He denied that anyone had their face covered when Perney or Mario arrived. He testified that Nicole was in the living room when he ran out after Mario was shot, and that he never talked to her, never saw anyone stand over her with a gun, and never saw anyone tape her hands or put her in a closet.

Appellant borrowed Johno's car for him and Plug to take back to Monroe. He testified that it was his plan to turn Plug in, but he did not want to indicate that because it is dangerous to be labeled a snitch. He returned to Houston the next day with several family members and cooperated with police.

During cross-examination, appellant was confronted with several earlier statements to police that contradicted his trial testimony, including a statement in an earlier interview that Plug and P-A had "attacked Perney by mistake. I was going to get in his pocket and get my money, and then I realized it was Perney. I said, 'Oh, let him go.'"[5] He also disputed the accuracy of other witnesses' testimony. For example, he denied saying to Perney, "Where is Mario?," but claimed he had instead asked Perney, "why did [sic] you tell me Mario was here?"

Appellant claimed that, when he confronted Mario, he had a gun in his back pocket and a knife in his hand because Mario is known to carry a gun. He

---

[5]    He did not deny this statement, but stated that he could "not recall" making it.

15

conceded on cross-examination, however, that he did not have the knife out because he was scared that Mario had a gun, but instead "had the knife just as a scare tactic reason" to compel Mario to give him money.

Appellant was also confronted during cross examination about the fact that everyone else consistently testified that he had been complaining that he lost $5,000 in the March incident when John and Chris were arrested and claimed that the police took their money. When he gave his first statement to police, however, he claimed the amount was $7,000. He denied changing his story to justify why he would have been entitled to take Mario's $7,000 after Mario was shot.

Finally, when appellant disputed Nicole's version of events, the State sought to impeach him with the portion of an affidavit he had signed stating that he had ordered Nicole to the ground and told her to get inside the living room closet. Appellant explained that he had signed the affidavit because it was part of a plea negotiation, and that his lawyer had read it and told him that it could not be used against him. Appellant's attorney did not object to this line of questioning. Appellant testified during redirect that the affidavit had been prepared by the district attorney's office.

### E. The Verdict and Judgment

The jury was charged with the offense of capital murder under three alternative theories (as a primary actor, as a co-conspirator, and as a party) and the

16

lesser-included offense of aggravated robbery. During deliberations, the jury sent a note requesting a copy of the affidavit referred to during appellant's testimony. The court instructed the jury that that the affidavit was not in evidence. The jury then requested a transcript of appellant's testimony, and was instructed that it would have to certify specifically that a particular aspect of the testimony was in dispute. The jury did not send a follow-up request for specific testimony. It returned a verdict finding appellant guilty of capital murder. The trial court entered a sentence of life imprisonment, and appellant timely appealed.

## ISSUES ON APPEAL

Appellant brings the following four issues on appeal:

1.  The evidence is insufficient to support Mr. Canfield's conviction for capital murder individually or as a party pursuant to TEXAS PENAL CODE ANN. §7.02(a)(2) for the reason that there was no evidence he was acting together with William Garrett in a common purpose at the time of the complainant's death.

2.  The evidence is insufficient to support Mr. Canfield's conviction for capital murder individually or as a party pursuant to TEX. PENAL CODE ANN. § (a)(2) for the reason that he did not intend to promote or assist William Garrett in the murder of the complainant.

3.  The evidence is insufficient to support Mr. Canfield's conviction for capital murder as a co-conspirator pursuant to TEX. PENAL CODE ANN. § 7.02(b).

4.  Mr. Canfield was denied the 6th Amendment right to the effective assistance of counsel for the reason counsel failed to object pursuant to TEX. RULE. EVID. 410(4) when the prosecutor

17

questioned the appellant about statements made during plea negotiations in an effort to impeach him.

## SUFFICIENCY OF THE EVIDENCE

In his first three points, the appellant challenges the sufficiency of the evidence to support his capital murder conviction.

### A. Applicable Law

A person commits capital murder "if the person commits murder as defined under Section 19.02(b)(1)" i.e., intentionally or knowingly causes the death of an individual, and "the person intentionally commits the murder in the course of committing or attempting to commit . . . robbery." TEX. PENAL CODE § 19.03 (Vernon 2011). A defendant who did not actually cause the death of the victim can nonetheless be convicted of capital murder under section 7.02 of the Texas Penal Code, which provides:

(a) A person is criminally responsible for an offense committed by the conduct of another if:

(1)    acting with the kind of culpability required for the offense, he causes or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense;

(2)    acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or

(3)    having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense.

18

(b) If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PENAL CODE ANN. § 7.02 (Vernon 2011).

In this case, the jury was properly instructed that it could find appellant guilty of capital murder either as a party to the offense under section 7.02(a)(2) or a co-conspirator under section 7.02(b).

## B. Standard of Review

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence).

The jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *see also Henderson*

*v. State*, 29 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (stating jury can choose to disbelieve witness even when witness's testimony is uncontradicted). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We afford almost complete deference to the jury's determinations of credibility. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.").

## C. Analysis

In his third point of error, appellant argues that there is insufficient evidence to support his conviction as a co-conspirator. *See* TEX. PENAL CODE § 7.02(b) (Vernon 2011) ("If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.").

20

He contends that "[t]hey drove to Houston to buy drugs, not to kill Mario." And he cites *Tippett v. State*, 41 S.W.3d 316 (Tex. App.—Fort Worth 2001), *overruled on other grounds by Hooper v. State*, 214 S.W.3d 9 (Tex. Crim. App. 2007), for the proposition that Plug's prior involvement in selling drugs "does not give rise to an inference he was violent as it has been found that drug dealing is not inherently violent compared to other criminal enterprises."

Appellant further argues that the facts here are distinguishable from other cases in which the courts have found sufficient evidence to support a capital murder conviction as a co-conspirator, pointing out that "there was no evidence the appellant knew [Plug] had a reputation for violence or 'hung out' with him prior to the instant cause," *see Queen v. State*, 940 S.W.2d 781, 788 (Tex. App.—Austin 1997, pet. ref'd), "no reason for [appellant] to have anticipated any violence towards the complainant as a result of any prior ill-will, or antagonism," *see Ross v. State*, 133 S.W.3d 618, 622 (Tex. Crim. App. 2004), and no evidence that appellant knew "of any plan [Plug] had to rob and murder Mario," *Vodochodsky v. State*, 158 S.W.3d 502, 510–11 (Tex. Crim. App. 2005).

Indeed, he insists that Plug's actions "were so unanticipated [appellant] asked him why he shot Mario to which [Plug] replied 'I didn't try to. I dropped it.'" Because appellant "could not have anticipated" Plug would kill Mario, he

urges us to find the evidence insufficient to support his conviction for capital murder.

In response, the State contends that the evidence is "sufficient to support appellant's conviction for capital murder as a conspirator." It argues that the "testimony affirmatively demonstrates that the victim was murdered during the course of a conspiracy to commit aggravated robbery." It points to evidence about the ongoing dispute between appellant and Mario about money Chris and John lost to the police in March 2009, and the evidence that appellant, Plug, and P-A hid in Perney's house and ambushed him to confront him over that lost money. The State disputes that "appellant's alleged lack of knowledge regarding his co-conspirator's propensity for violence" renders the evidence insufficient.

The State argues the "fact that appellant armed himself with a handgun and a knife and participated in the robbery constitutes additional circumstantial evidence that he should have anticipated the resulting murder." And the State contends that appellant's argument ignores that "Texas courts have consistently held that all parties participating in a robbery are guilty of a murder which occurs in the course of a conspiracy to commit robbery." *See Green v. State*, 682 S.W.2d 271, 285–86 (Tex. Crim. App. 1984); *Ruiz v. State*, 579 S.W.2d 206, 209 (Tex. Crim. App. 1979); *Naranjo v. State*, 745 S.W.2d 430, 433–34 (Tex. App.—Houston [14th Dist.] 1988, no pet.). Accordingly, the State argues, "a rational trier of fact could

have found beyond a reasonable doubt that murder should have been anticipated as a result of carrying out the conspiracy to commit aggravated robbery." We agree.

To convict appellant for capital murder as a co-conspirator, the State had to prove (1) appellant was a party to a conspiracy to commit aggravated robbery, (2) capital murder was committed by appellant or someone acting with him, (3) the capital murder was committed in furtherance of the conspiracy to commit aggravated robbery, and (4) appellant should have anticipated that capital murder could occur as a result of the aggravated robbery. *E.g.,* TEX. PENAL CODE ANN. § 7.02(b); *Hartsfield v. State*, 305 S.W.3d 859, 869 (Tex. App.—Texarkana 2010, pet. ref'd). The State "does not have to prove that the accused intended to shoot or kill the victim, or intended that the victim be shot, as long as the evidence established he conspired to commit the robbery and that he 'should have' anticipated the murder as a result of carrying out the conspiracy to commit the robbery." *Davis v. State*, 276 S.W.3d 491, 495 (Tex. App.—Waco 2008, pet. ref'd).

### 1. Evidence of conspiracy to commit aggravated robbery

The Texas Penal Code defines robbery as: in the course of committing theft, and with the intent to obtain or maintain control of the property, a defendant knowingly or recklessly causes bodily injury to another or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.

23

*See* TEX. PENAL CODE ANN. § 29.02(a) (Vernon 2011); *Sholars v. State*, 312 S.W.3d 694, 703 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). Aggravated robbery is robbery that causes serious bodily injury to another, or is committed while using or exhibiting a deadly weapon. *See* TEX. PENAL CODE ANN. § 29.03 (Vernon 2011).

The jury was instructed that conspiracy means "an agreement between two or more persons with intent that they, or one or more of them, engage in conduct that would constitute the offense." *See* TEX. PEN. CODE ANN. § 15.02(a) (Vernon 2011); *see also Hooper v. State*, 255 S.W.3d 262, 265–66 (Tex. App.—Waco 2008, pet. ref'd). The jury was also correctly instructed that such agreement "may be inferred from acts of the parties." TEX. PENAL CODE ANN. § 15.02(b). The court may look to events occurring before, during, and after the commission of the offense as evidence of criminal responsibility under the law of parties. *Ervin v. State*, 333 S.W.3d 187, 201 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) ("Since an agreement between parties to act together in common design can seldom be proven by words, the State often must rely on the actions of the parties, shown by direct or circumstantial evidence, to establish an understanding or a common design to commit the offense.").

There is both direct and circumstantial evidence of such an agreement among appellant, Plug, and P-A to commit aggravated robbery in this case.

24

Appellant admitted that he had an ongoing dispute with Mario because he thought Mario should replace the money that was lost by Chris's and John's failed March 2009 drug run. Mario's wife Nicole testified that appellant had previously threatened Mario during an argument over that money. When appellant called Lashaka to tell her that he was coming to Houston, he told her that something bad was going to happen.

Appellant testified that he saw Mario's group pull up to the Dulcimer house the first time on Saturday before Mario decided to leave to go to the clothing store. The next person to enter the house, Perney, was ambushed by Plug and appellant brandishing weapons with their faces covered. When appellant realized it was Perney, he demanded to know where Mario was.

When Mario and Nicole later entered the house, according to Nicole's testimony, one of the three people in the house—appellant, Plug, or P-A—was hiding in the closet, and the other two were likewise hiding, as Nicole did not see or hear anyone in the house. When she later saw them, all three initially had their faces covered, and appellant and Plug had guns in their hands. Nicole testified that "They were asking me where the money was."

Appellant admits that he was the first to approach Mario, and that he confronted Mario with a gun on his person and a knife in his hand. He testified that he asked Mario "Where is my money?" and that he had the knife out as a scare

25

tactic to get Mario to hand over money. He testified that he and Plug both got the guns they were carrying from P-A at some point earlier, which indicates advanced planning of the robbery among the three. Chris, John and Nicole all testified that Mario had $7,000 in his pocket, and that it was missing after he was shot. Appellant, Plug, and P-A all fled the scene together, and appellant returned to Monroe with Plug. Taken together, this is ample evidence that the three conspired to commit aggravated robbery. *Ervin*, 333 S.W.3d at 201 (holding evidence sufficient to demonstrate conspiracy to commit aggravated robbery in capital murder trial premised on co-conspirator liability when defendant knew of the plan to commit robbery, knew accomplices had guns, watched them put on masks and hooded sweatshirts, and returned to pick them up after hearing gun shots).

### 2. Evidence that capital murder was committed by co-conspirator

The State was required to prove that the capital murder was committed by appellant or someone acting with him. Appellant testified that Plug killed Mario, and does not dispute that on appeal.

### 3. Evidence that Mario was killed in furtherance of conspiracy

There is sufficient evidence that Plug killed Mario in furtherance of the conspiracy to commit aggravated robbery. Appellant testified that both he and Plug got the guns they used from P-A, presumably for use in furtherance of the

26

aggravated robbery.[6] The jury heard evidence that Plug and appellant together first ambushed Perney with guns, and the fair inference from the evidence is that they initially thought they were instead ambushing Mario, as they had previously seen Mario's group pull up outside, and did not have reason to be expecting Perney. They also questioned Perney about Mario's whereabouts before letting him go.

Appellant admits that he confronted Mario about his money immediately before Mario was shot. Appellant contends that he left the bathroom, and then Plug ran in and shot him. According to Nicole's testimony, appellant and Plug were in the bathroom together with Mario when he was shot. Someone took Mario's money from his pocket immediately after he was shot, and then appellant, Plug, and P-A fled the scene together. There is sufficient evidence for the jury to conclude that Mario was shot in furtherance of the conspiracy to commit aggravated robbery. *E.g.*, *Davis v. State*, 276 S.W.3d 491, 494–96 (Tex. App.—Waco 2008, pet. ref'd) (evidence was sufficient that capital murder was in furtherance of conspiracy to commit aggravated robbery in light of testimony that defendant recruited three others to rob victim, provided them with guns and drove them to site of robbery, where co-conspirators kicked down door and demanded

---

[6] Appellant admitted that he got a gun from P-A to use in confronting Mario about the lost money. He testified that Plug also got the shotgun from P-A, but did not specifically testify as to the purpose of Plug obtaining the shotgun.

27

money from victim, and then returned fire that killed victim after victim began shooting at them).

### 3. Evidence that appellant should have anticipated capital murder

Appellant focuses his argument primarily on attacking the sufficiency of the evidence to satisfy the last requirement, i.e., that the State prove that he should have anticipated that capital murder could occur as a result of the aggravated robbery. The record shows that appellant and Plug armed themselves before Perney or Mario arrived, and both Perney and Nicole testified to seeing both appellant and Plug with firearms in their hands. Although appellant testified that he did not threaten Mario with the gun nor did he expect Plug to, the jury heard Perney's testimony that appellant stood beside Plug as Plug had a shotgun pointed at him when they accidently ambushed him first.

The facts here are similar to those that the Fourteenth Court considered in *Whitmire v. State* and found to be sufficient to support a finding that a murder by the co-conspirator during an aggravated robbery was foreseeable. 183 S.W.3d 522, 526–27 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). In that case, the defendant planned to rob the victim (a potentially armed drug dealer) and recruited two other armed men to assist, one of whom ended up shooting the robbery victim. *Id*. at 526. The defendant did not attempt to stop the confrontation, made no attempt to render aid to the victim after the shooting, and did not report the crime

28

by his co-conspirator. *Id.* On appeal, the court held the evidence was sufficient to show the defendant should have anticipated the murder in the course of the aggravated robbery and, thus, sufficient to support his conviction for capital murder. *Id.*

Indeed, we have previously admonished that "[e]vidence that a defendant knew his co-conspirators might use guns in the course of the robbery can be sufficient to demonstrate that the defendant should have anticipated the possibility of murder occurring during the course of the robbery." *Love v. State*, 199 S.W.3d 447, 453 & n.1 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *see also Green v. State*, 682 S.W.2d 271, 285–86 (Tex. Crim. App. 1984) (holding jury could rationally conclude that murder should have been anticipated as possible result of robbery when appellant admitted entering house with co-conspirators armed with gun for the purpose of stealing firearms from the house); *Williams v. State*, 974 S.W.2d 324, 330 (Tex. App.—San Antonio 1998, pet. ref'd) (rejecting argument that murder was an impulsive act by co-conspirator and instead holding evidence sufficient to show that murder committed in course of pawn-shop robbery should have been anticipated by appellant given that at least one of five conspirators arrived at scene armed with gun, there was testimony by accomplice witness that four of five conspirators left apartment with weapons, and there was evidence that bullets or casings from two different guns were recovered from scene); *Coleman v.*

29

*State*, 956 S.W.2d 98, 102 (Tex. App.—Tyler 1997, pet. ref'd) (holding evidence sufficient to support finding that appellant should have anticipated murder as result of conspiracy to commit carjacking when evidence showed that, just prior to murder, co-conspirator unsuccessfully tried to carjack another vehicle in appellant's presence by wielding .45 caliber pistol, co-conspirator announced he was going to get victim's car, and after following victim home, co-conspirator armed himself with .45 caliber pistol, appellant armed himself with sawed-off shotgun, appellant admitted having knowledge of weapons in car, and appellant admitted supplying shotgun).

We agree with the State that *Tippitt v. State*—the case cited by appellant for the proposition that Plug's involvement in the sale of drugs "does not give rise to an inference he was violent as it has been found that drug dealing is not inherently violent compared to other criminal enterprises"—is distinguishable. In that case, the court held that although the defendant entered into a conspiracy to commit robbery, his capital murder conviction as a co-conspirator could not stand without some additional evidence showing that he should have anticipated the robbery would result in murder. 41 S.W.3d at 326 ("We do not believe robbery is an offense of such a violent nature that murder should always be anticipated as a potential risk of its commission, and we have found no case that suggests otherwise."). Significantly, unlike appellant here, the defendant in *Tippitt* did not

30

know that his co-conspirator had a gun on his person, and the court relied on that fact to distinguish cases holding that murder is foreseeable when a gun is used in the commission of a robbery. *Id*. at 325–26. *Tippitt* is inapposite, and thus does not support appellant's argument that the evidence is insufficient to show that he should have anticipated the murder.

Because there is sufficient evidence to support appellant's conviction for capital murder as a co-conspirator, we overrule appellant's third issue. We accordingly need not reach his first or second issues, which challenge the sufficiency of the evidence to support his capital murder conviction as a primary actor or party to the offense. *E.g.*, *Whitmire*, 183 S.W.3d at 526–27 (when the jury is instructed on alternative bases for capital murder, i.e., "(1) as the principal shooter; (2) as a party to the offense; or (3) under conspirator liability" and the jury returns a general verdict of guilty for capital murder, the appellate court can affirm the conviction if there is evidence to support the verdict on any of the instructed bases).

## INEFFECTIVE ASSISTANCE OF COUNSEL

In his fourth issue, appellant complains that his trial lawyer rendered ineffective assistance of counsel by failing to object to the State's use of an affidavit he gave during plea negotiations for impeachment purposes.

## A. Applicable Law

The Texas Rules of Evidence specifically limit the admissibility of certain evidence related to plea discussions:

> Except as otherwise provided in this rule, evidence of the following is not admissible against the defendant who made the plea or was a participant in the plea discussions:
>
> (1) a plea of guilty that was later withdrawn;
>
> . . . .
>
> (4) any statement made in the course of plea discussions with an attorney for the prosecuting authority, in a civil case, that do not result in a plea of guilty or that result in a plea of guilty later withdrawn, or in a criminal case, that do not result in a plea of guilty or a plea of nolo contendere or that results in a plea, later withdrawn, of guilty or nolo contendere.
>
> However, such a statement is admissible in any proceeding wherein another statement made in the course of the same plea or plea discussions has been introduced and the statement ought in fairness be considered contemporaneously with it.

TEX. R. EVID. 410. Impeachment of the defendant is not a permissible use of statements made during plea negotiation. *Abdygapparova v. State,* 243 S.W.3d 191, 206 (Tex. App.—San Antonio 2007, pet. ref'd) ("Rule 410 should bar the use of pleas and plea related statements for impeachment. Thus, the trial court erred in allowing the State to proceed with questions relating to statements made during plea negotiations."); *Taylor v. State*, 19 S.W.3d 858, 863 (Tex. App.—Eastland 2000, pet. ref'd) (holding that trial court's allowing State's use of plea negotiation for purpose of impeachment was "clear error"); *see also Hardin v. State*, No. 03-

32

00-00337-CR, 2001 WL 325047, at *2 (Tex. App.—Austin April 5, 2001, pet. ref'd) (noting appellant's argument that "no exception exists allowing use of [Rule 410] evidence for impeachment . . . comports with" several cases) (mem. op., not designated for publication).[7]

## B. Standard of Review

In determining whether counsel's representation was so inadequate as to violate a defendant's Sixth Amendment right to counsel, Texas courts adhere to the two-pronged test enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984); *see also Hernandez v. State*, 726 S.W.2d 53, 55 (Tex. Crim. App. 1986). Judicial review of an ineffective assistance of counsel claim must be highly deferential to trial counsel and avoid using hindsight to evaluate counsel's actions. *Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984). There is a strong presumption that counsel's conduct fell within the wide range of reasonable

---

[7]     *But cf. Bowley v. State*, 310 S.W.3d 431, 435 (Tex. Crim. App. 2010) (holding State's cross-examination of defendant about plea negotiations was permissible to demonstrate that defendant's potential motive for pleading "not guilty" at trial was his belief that he had not been offered a light enough sentence during negotiations; defendant "opened the door" by testifying that he pleaded guilty in the past to DWI because he was guilty and pleaded "not guilty" in this case because he was not guilty). Four justices in *Bowley* dissented with the view that Rule 410 does not allow such evidence even if the defendant otherwise "opened the door," *Id*. at 436–37 & 442 n.4 (Price, J., dissenting, joined by Meyers, Johnson, and Holcomb, J.J.), and that, in any event, the trial court could have exercised discretion to exclude the evidence under Rule 403. *Id*. at 441–42 (Holcomb, J., dissenting, joined by Meyers, Price, and Johnson, J.J.). The State has not argued that appellant "opened the door" under *Bowley*'s narrow exception here, and we conclude that *Bowley*'s facts are distinguishable.

professional assistance. *Strickland*, 466 U.S. at 690, 104 S. Ct. 2066. The burden is on appellant to prove by a preponderance of the evidence that counsel was ineffective. *See McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996) (en banc). To meet this burden, an appellant must first prove that counsel's performance was deficient, i.e., that counsel's assistance fell below an objective standard of reasonableness. *Id*. If the appellant has demonstrated deficient assistance of counsel, it is then necessary that the appellant affirmatively prove that he was prejudiced by the deficient assistance. *Id*. In proving prejudice, appellant must prove a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id*.; *Hernandez*, 726 S.W.2d at 55. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Hernandez*, 726 S.W.2d at 55.

Any allegation of ineffective assistance of counsel must be firmly founded in the record and the record must affirmatively demonstrate the alleged ineffectiveness. *McFarland*, 928 S.W.2d at 500. Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *Id*. Absent both showings, an appellate court cannot conclude the conviction resulted from a breakdown in the adversarial process that renders the result unreliable. *Ex parte Menchaca*, 854 S.W.2d 128, 131 (Tex. Crim. App. 1993). Appellate courts look to the totality of the representation and

the particular circumstances of each case in evaluating the effectiveness of counsel. *Ex parte Felton*, 815 S.W.2d 733, 735 (Tex. Crim. App.1991). It is possible that a single egregious error of omission or commission by appellant's counsel can constitute ineffective assistance. *Id.*

**C. Analysis**

The entire exchange that is the subject of appellant's fourth issue is as follows:

> [STATE'S COUNSEL]: May I approach the witness, Judge?
>
> THE COURT: You may.
>
> Q. I'm going to show you what's marked just for identification purposes as State's Exhibit 111. Can you read the top line there? What does it say right there (indicating)?
>
> A. "Before me the under –"
>
> Q. No. "Affidavit of . . ."
>
> A. "Affidavit of Jonathan Canfield."
>
> Q. So it's your affidavit, right?
>
> A. Yes.
>
> Q. These are your legal warnings explaining to you, you don't have to give this, right? Those are your initials by all those legal warnings, right?
>
> A. Yes.
>
> Q. It's a typewritten statement, right?
>
> A. Yes.
>
> Q. In fact, if you turn to the second page, the date of this affidavit is October 28, 2011, right?
>
> A. Yes, but that's part of a plea deal.
>
> Q. No, that wasn't a plea deal. This is you giving an affidavit, wasn't it?

A. Yes, but it was part of the plea deal they gave me.

Q. There was no agreement. In fact, it says, this is just an affidavit for you to give possible truthful testimony, and you are not promised anything for this affidavit, right?

A. My attorneys read it, and they said it can't be used against me.

Q. Is that your signature there?

A. Yes, sir.

Q. It says, "I went into living room area of the house and came into contact with Nicole. I displayed my handgun and ordered her to get on the ground. I eventually told Nicole to get inside the closet that was located in the living room," didn't you? That's saying something about Nicole, right?

A. Yes, but that was all part of a plea deal.

Appellant argues that his "credibility was critical to the resolution of his case" because his "testimony was the only evidence offered by counsel as to what occurred at the time of the shooting." He complains that the State's use of an affidavit he signed during plea negotiations for impeachment was in direct violation of Rule 410(4) of the Texas Rules of Evidence, and that allowing such impeachment undermines the strong policies behind Rule 410 of facilitating and encouraging plea negotiations. For these reasons, he argues that the trial court would have erred in overruling any objection to the State's use of this evidence, and that his attorney rendered deficient performance by failing to object. Finally, appellant insists he was harmed by his counsel's error because it undermined his credibility with the jury. He points out that the complained-of exchange came near the end of his testimony, and was obviously fresh in the jury's mind because the

36

jury requested a copy of the affidavit.  He also notes that the mere mention of plea

negotiations can cast doubt over a defendant's innocence.

In response, the State first argues that the record is not sufficiency developed

to establish whether appellant's affidavit was, in fact, provided in the course of

plea discussions.[8]  Alternatively, the State contends that we should defer to

appellant's counsel if there is at least the possibility that the conduct could have

---

[8]   The State does not dispute that plea negotiations occurred; indeed the record (outside the jury's presence) reflects they did occur, but no deal was reached because appellant would not accept a punishment of greater than 40 years' confinement.  The State instead contends that appellant's uncontroverted testimony that he signed a written statement, drafted by the district attorney's office, during plea negotiations on the advice of his counsel (who told him that the statement would be inadmissible) is insufficient to bring the statement within the purview of Rule 410.  In support, the State cites five pre-Rule 410 cases for the proposition that appellant must prove that his statement was "induced by promises that are: (1) positive; (2) made or sanctioned by someone in authority; (3) of some benefit to the accused; and (4) of such character as would be likely to influence the accused to speak untruthfully."  But the plain language of Rule 410 renders inadmissible "any statement *made in the course of plea discussions* with an attorney for the prosecuting authority," (emphasis added) not only statements first induced by a particular promise.  In any event, none of the cases the State cites involve similar evidence or arguments.  *See Richardson v. State*, 667 S.W.2d 268, 269 (Tex. App.—Texarkana 1984, pet. ref'd) (reversing conviction because admission of defendant's confession from aborted plea deal was error); *Fisher v. State*, 379 S.W.2d 900, 901 (Tex. Crim. App. 1964) (reversing conviction because it was error to refuse to instruct jury to determine voluntariness of confession made to defendant's employer/minister, who promised to not press charges); *Washington v. State*, 582 S.W.2d 122, 124 (Tex. Crim. App. 1979) (reversing conviction because it was error to admit defendant's confession made as part of a plea bargain to avoid earlier trial); *Walker v. State*, 626 S.W.2d 777, 778 (Tex. Crim. App. 1982) (reversing conviction because it was error to admit confession made as part of a plea deal); *Wayne v. State*, 756 S.W.2d 724, 733 (Tex. Crim. App. 1988) (holding confession was admissible because appellant did not establish that statement to police officer was part of plea negotiations; appellant himself did not testify to engaging in plea discussions (either before or outside the presence of the jury), and the circumstances surrounding the discussion did not otherwise reflect circumstances that would be expected in a negotiation session).

been legitimate trial strategy. The State does not speculate as to what a legitimate trial strategy would have been for the failure to object.

Finally, the State argues that appellant has not demonstrated prejudice, i.e., that but for counsel's isolated failure to object to testimony regarding the affidavit, the outcome of the trial would have been different. The State posits that appellant's credibility was undermined by the numerous inconsistencies between his trial testimony and his other prior statements to police that were the proper subject of impeachment. Moreover, the State points out, appellant's defense was undercut by the highly implausible nature of the defensive theory he presented at trial.

The affidavit complained of here, which was not admitted into evidence, was prepared by one of the prosecuting attorneys at trial and, oddly, the portion of the affidavit that the State used in cross-examining appellant does not square with any witnesses' version of about what happened immediately after the shooting—not appellant's nor Nicole's. While the statements from the affidavit were not related to Mario's shooting, their admission could have been harmful in the sense that they did contradict appellant's trial testimony (going to his credibility) and they did reveal that he had engaged in plea negotiations (potentially supporting an inference of guilt).

38

Assuming without deciding that appellant has demonstrated that his lawyer's failure to object to the State's use of this affidavit amounted to deficient performance under *Strickland*, we nonetheless hold that appellant has failed to demonstrate—on this record—that he was prejudiced by his counsel's failure to object to the State's cross-examination about statements in the affidavit.

Appellant's primary contention is that the inconsistencies between the affidavit and his trial testimony were damaging to his credibility, which was critical in this case. But the inconsistencies between the quoted portions of the complained-of affidavit and appellant's testimony at trial only relate to whether appellant spoke to Nicole and ordered her into the closet. Any damage to appellant's credibility caused by that inconsistency is paled by the damage from the significant other inconsistencies the jury witnessed between appellant's trial testimony on one hand, and his earlier statements and the testimony of other witnesses on the other. Indeed, appellant was presented with so many inconsistencies between earlier statements and his trial testimony that at one point he agreed that "every word out of [his] mouth is basically a lie" in his first statement to police.

Moreover, the damning admissions that appellant made during his own testimony—including his admissions that he planned and committed aggravated robbery of Mario, that he and Plug armed themselves with guns earlier in the day

before ambushing Mario, that he fled the house without rendering aid or assistance to Mario, and that he ultimately drove all the way back to Monroe with Mario's killer—render the issue of credibility significantly less important in this case, as the jury could have believed every word of appellant's trial testimony and still convicted him of capital murder as a co-conspirator.

Appellant also argues that this State's use of the affidavit "cast considerable doubt over whether [he] was in fact not guilty because it can be easily inferred he would not have entered into guilty plea negotiations if he was innocent." He cites Justice Holcomb's observation in his dissent in *Bowley*, that the "potential impact on jurors of the mention of plea negotiations cannot be overstated." 310 S.W.3d at 442 (Holcomb, J., dissenting). That is a proposition with which we agree, but the potential harm depends in large part on the nature of the defendant's defense in a particular case. In *Bowley*, the defendant was on trial on his third DWI charge. He testified that he pleaded "guilty" on the prior charges because he was guilty, and that he pleaded "not guilty" in the current case, because he was not guilty. *Id.* The harm in mentioning plea negotiations in that situation is the risk that the jury will conclude that a person who is innocent would not contemplate admitting guilt. *Id.* at 442 (Holcomb, J., dissenting).

Here, appellant was charged with capital murder as a party and co-conspirator, and with the lesser-included offense of aggravated robbery. Appellant

40

admitted to being at the scene with a gun and a knife, and admitted to confronting Mario with two weapons to intimidate him into turning over his money. In other words, he admitted in front of the jury to committing the crime of aggravated robbery, one of the two crimes he was charged with. Appellant also testified that he spoke with police several times and that his motivation in doing so was to assist the investigation, bring justice for Mario, and inform the police that Plug was responsible for Mario's death. The theme of his defense at trial was that the crimes were not premeditated, that he did not conspire with Plug, and that he could not have anticipated Plug would shoot Mario. In light of the charges, appellant's testimony, and appellant's defense, the fact that appellant engaged in some type of plea negotiations would not necessarily be contrary to appellant's version of events. Thus, on this particular record, we do not agree that revealing to the jury that plea negotiations had taken place would have the same prejudicial impact as it would in a case such as *Bowley*, in which a defendant has presented a defense that is wholly inconsistent with the charged offenses, leading to the inference that plea negotiations were only contemplated because the defendant was guilty.

Because appellant has not shown that "there is a reasonable probability that, absent [his lawyer's failure to object to the questioning about the affidavit], the factfinder would have had a reasonable doubt respecting guilt," he has not demonstrated he is entitled to a new trial. *Perez v. State*, 310 S.W.3d 890, 894

41

(Tex. Crim. App. 2010) (citing *Strickland*, 466 U.S. at 695). We accordingly overrule appellant's fourth issue.

## CONCLUSION

We affirm appellant's conviction.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Sharp and Massengale. Justice Sharp, concurring in judgment only.

Publish.   TEX. R. APP. P. 47.2(b).