**Reversed and Rendered and Majority and Dissenting Opinions filed August 25, 2015.**



**In The**

# Fourteenth Court of Appeals

## NO. 14-13-00763-CR

### VINCENT JOHN ZAHORIK, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the County Court at Law No 2**
**Galveston County, Texas**
**Trial Court Cause No. MD-0322640**

## M A J O R I T Y    O P I N I O N

Appellant Vincent John Zahorik appeals his conviction for making a false report to a police officer or law enforcement agency, challenging the legal sufficiency of the evidence to support his conviction. We hold the evidence is legally insufficient to support appellant's conviction because the State did not offer evidence that appellant made his report in bad faith and for reasons other than to obtain action on a valid grievance. We therefore reverse his conviction and render a judgment of acquittal.

BACKGROUND

Appellant testified at trial. According to appellant's testimony, on December 16, 2011, he received a notice from Equifax informing him that his credit report was checked for employment purposes by a department of the State of Tennessee.[1] Appellant had not applied for employment in Tennessee, and he became concerned because he had filed complaints against some officers in that state in connection with a prior arrest that led to a criminal prosecution of appellant in Tennessee for a traffic offense.[2] Appellant contacted Equifax and was told he needed to file a report with the Federal Trade Commission (FTC). The FTC told appellant that in order to conduct an investigation, he needed to provide a police report establishing that someone had unlawfully accessed his credit report without his permission. Appellant subsequently contacted the Tennessee Highway Patrol and the Galveston Police Department. Appellant's report to the Galveston Police Department led to his conviction for making a false report, but his contacts with the Tennessee Highway Patrol are important in analyzing the sufficiency of the evidence to support that conviction.

Appellant sent a letter to Captain Victor Donoho of the Tennessee Highway Patrol on December 27, 2011. The letter informed Donoho of the Equifax notice and that appellant had filed a complaint with the FTC regarding the improper credit check. Appellant's letter further states: "The FTC has also instructed me to file this complaint with your office as well as the Attorney General's office for Identity Theft/Fraud as well as violating my right to privacy."

Appellant spoke with Donoho on December 29 and followed up with

---

[1] The letter did not specify which department received appellant's file.

[2] The allegations in appellant's complaint were investigated twice and determined to be unfounded.

another letter that same day. In the December 29 letter, appellant writes that he feels "somewhat better knowing that my credit report was accessed by your investigator, per the [prosecuting attorney's] request, as opposed to thinking a rogue agent was accessing this information for other more severe retaliatory efforts." The letter indicates that appellant expected more information to be forthcoming:

> After your investigator returns from vacation, and you are in a better position to understand all the circumstances surrounding this special request, please provide me with this information. It just seems to me, all this confusion could have been alleviated, had the usual protocol been followed in obtaining such information through the courts as opposed to requesting this information under the guise of "employment purposes" as stated in the correspondence from Equifax. The timing of this breach of privacy as well as the illegal and/or unorthodox means of procurement is what I find the most disturbing. Please feel free to give me a call anytime to discuss this matter . . .

Appellant later contacted the Galveston Police Department. He spoke with an operator and told her that he needed to report a possible identity theft or fraud. On January 5, 2012, Officer Brandon Kiamar came to appellant's residence. According to appellant, he provided Kiamar with the Equifax notice and the December 27 and December 29 letters addressed to Donoho. Appellant testified that he told Kiamar he was concerned about retaliation, and he needed a police report so that the FTC and Equifax would conduct their investigations. Appellant stated that he informed Kiamar that it was possible someone with the Tennessee Department of Safety or the Tennessee Highway Patrol was involved in checking his credit report. Appellant said he also told Kiamar that he knew which agency obtained his credit report but did not know the identity of the individual who obtained it.

After meeting with Kiamar, appellant wrote another letter to Captain

3

Donoho.[3]  In the letter, dated January 5, 2012, appellant informed Donoho that he filed an "Identity Theft/Fraud complaint" with his local police department due to the recommendation of the FTC.  The letter concludes:

> Until I hear differently from you, and you have completed your investigation into the matter, I will continue with the fear and belief this breach of privacy was done for some type of retaliatory or malicious efforts.  Please let me know if the appropriate Request for Record was completed prior to initiating this invasive action.  After you have had time to meet with your investigator, and have a better understanding of what all was involved, please give me a call . . . .

Appellant testified that he sent the letter the same day of Kiamar's visit.

Captain Donoho and Officer Kiamar both testified during the trial.  Captain Donoho testified that he first learned that appellant's credit report was improperly obtained when he received the December 27 letter via fax.  Donoho stated that as a result of appellant's letter, he contacted the lead investigator in appellant's criminal case and was informed that appellant's credit was checked at the request of the prosecuting attorney.  The lead investigator did not know why the credit check was run for employment purposes rather than criminal purposes.  Donoho stated that he relayed this information to appellant during the telephone call on December 29.  Donoho advised appellant that the Department of Safety checked his credit, not a "rogue trooper" or "anyone other than a criminal investigator pursuant to his pending criminal charges."  Donoho claimed that he "thoroughly explained on the 29th to the defendant that a member of the Department of Safety" checked his credit history "as part of the criminal investigation."  Donoho admitted that he did not know the identity of the individual that improperly obtained the credit report during his initial conversation with appellant, and that when appellant filed the identity theft report, appellant likewise did not know the identity of the person

---

[3] Appellant said he sent approximately 70 letters to Donoho.

responsible. Donoho also admitted that appellant kept requesting information after they spoke, and that he told appellant months later that disciplinary action had been taken against those who obtained the credit report.

Officer Kiamar testified that he visited appellant's residence on January 5, 2012. Kiamar said appellant sought to report the crime of identity theft and provided him with three letters: (1) the notice from Equifax; (2) a letter appellant sent to Equifax stating that he never applied for employment in Tennessee and requesting more information; and (3) the December 27 letter in which appellant informed Captain Donoho that his credit had been checked for employment purposes by someone from the Tennessee Highway Patrol. Kiamar denied receiving the December 29 letter, in which appellant acknowledges speaking with Donoho and being told that his credit report was accessed by an investigator at the request of the prosecuting attorney.

During the State's direct examination, Kiamar stated that appellant did not inform him that the Tennessee Department of Safety or the Tennessee Attorney General checked his credit. Kiamar asserted that this information would have been important to his investigation, as he would not have filed a report. According to Kiamar, this would not have been a case of identity theft.

On cross-examination, however, Kiamar testified that appellant did make him aware of his suspicion that someone with the Tennessee Highway Patrol or Tennessee Department of Safety had been involved in improperly obtaining his credit report. Kiamar also admitted that the December 27 letter contained information demonstrating that appellant knew that someone from the Tennessee Highway Patrol accessed his credit report. Kiamar testified that Galveston Police Department policy instructs officers to direct identity theft victims to contact the FTC, and that appellant indicated he had already spoken with the FTC. Kiamar

5

conceded that officers do not expect people who call them for assistance to have studied the law, and that ordinarily if an individual believes the law has been violated and files a report, officers do not file a false police report claim against them if it turns out that belief is mistaken. In addition, Kiamar testified that police officers do not typically hold it against a person because they used the wrong term to describe a crime.

During the testimony of both Captain Donoho and Officer Kiamar, appellant's trial counsel attempted to introduce the Fair Credit Reporting Act into evidence to show that the Tennessee investigator violated the Act by obtaining appellant's credit report under false pretenses. The State objected on relevance grounds in both instances, and the trial court sustained both objections. Appellant's counsel also requested that the trial court include a portion of the Act in the jury charge, but the court denied the request. The trial court did take judicial notice of the Act during the charge conference.

In early February 2012, appellant spoke to Sergeant Jeremy Kylen of the Galveston Police Department. According to appellant, Kylen told him that a warrant would be issued for his arrest for making a false police report. Sergeant Kylen testified that he was assigned to appellant's identity theft case. He contacted Donoho and learned that appellant's credit history was checked as a result of a criminal investigation. Donoho sent Kylen an email containing a scanned copy of the December 29 letter from appellant.

After receipt of the email, Kylen terminated his investigation into appellant's report, concluding there was no identity theft. Instead he sought charges against appellant for making a false report to a police officer. Appellant was charged, tried, and convicted. This appeal followed.

6

In his second issue, appellant challenges the legal sufficiency of the evidence to sustain his conviction, arguing that his credit was run improperly. We begin with this issue because it would afford him the greatest relief. *See* Tex. R. App. P. 43.3; *Campbell v. State*, 125 S.W.3d 1, 4 n.1 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

**I.      The evidence is legally insufficient to convict appellant of making a false report to a police officer or law enforcement agency.**

**A.      Standard of review**

We review evidentiary sufficiency challenges under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). The reviewing court must consider the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Anderson v. State*, 416 S.W.3d 884, 888 (Tex. Crim. App. 2013).

The jury is the sole judge of the credibility of witnesses and the weight to afford their testimony. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses, disbelieve any or all of the evidence or testimony proffered, and weigh the evidence as it sees fit. *See Canfield v. State*, 429 S.W.3d 54, 65 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). When the record supports conflicting inferences, the reviewing court presumes the trier of fact resolved the conflicts in favor of the State and defers to that determination. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Sufficiency of the evidence should be measured not by the instructions given

to the jury, but by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.[4] *Id.*

## B.    Applicable law

Under section 37.08 of the Texas Penal Code, a person commits the offense of False Report to a Peace Officer, Federal Special Investigator, or Law Enforcement Employee if, with intent to deceive, he knowingly makes a false statement that is material to a criminal investigation and makes the statement to any employee of a law enforcement agency that is authorized by the agency to conduct the investigation and that the actor knows is conducting the investigation. Tex. Pen. Code Ann. § 37.08(a)(2) (West 2011).

---

[4] In this case, the language of the information charges appellant with an offense different from the one for which he was tried. The information alleges that appellant

> [d]id then and there knowingly initiate a report of a past offense, to wit: Stating he was a victim of identity theft and/or he did not know who was responsible, and the defendant knew that said report was false or baseless and would ordinarily cause action by an official agency organized to deal with emergencies, namely, Galveston Police Department.

This language is contained in section 42.06 of the Texas Penal Code, entitled False Alarm or Report. *See* Tex. Pen. Code Ann. § 42.06 (West 2011). The information thus authorizes a hypothetically correct jury charge for a completely different offense. We realize that this discrepancy implicates due process concerns, and that the Court of Criminal Appeals has stated that it is "clearly not willing to allow the hypothetically correct charge to wholly re-write the indictment to charge a different offense." *Gollihar v. State*, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); *see also Thomas v. State*, 454 S.W.3d 660, 666–67 (Tex. App.—Texarkana Dec. 30, 2014, pet. ref'd) (remanding for new trial after conviction for offense not charged in indictment because defendant was "denied a fair and impartial trial" even though trial focused on offense for which defendant was convicted). We need not address this issue, however, as it was not raised in appellant's brief and we are reversing and rendering a judgment of acquittal on a different ground.

In *Wood v. State*, the Court of Criminal Appeals held that when a person is reporting police or other official misconduct, the State must additionally prove that the defendant's representations were made in bad faith and for reasons other than to obtain action on a valid grievance. 577 S.W.2d 477, 480 (Tex. Crim. App. [Panel Op.] 1978). The court concluded that these additional proof requirements were necessary to safeguard the defendant's constitutional right to petition the government for redress of grievances. *Id.* at 479 (citing Tex. Const. art. I, § 27). Appellant argues—and the State concedes—that the *Wood* elements should be part of the hypothetically correct jury charge used to measure the sufficiency of the evidence in this case because appellant's report concerned possible misconduct by law enforcement officers in Tennessee. We agree. *See also McGee v. State*, 671 S.W.2d 892, 895 (Tex. Crim. App. 1984).

## C.    Sufficiency of the evidence

The State had the burden to produce evidence from which a rational juror could conclude beyond a reasonable doubt that appellant's representations were made in bad faith and for reasons other than to obtain action on a valid grievance.[5] It failed to do so. Appellant offered evidence that his representations to Officer Kiamar were made in good faith to obtain action on the grievance that his credit was run improperly. According to appellant, the FTC told him that for it to conduct an investigation, appellant needed to provide a police report establishing that someone had unlawfully accessed his credit report without his permission. Appellant then spoke with Officer Kiamar on January 5 to obtain that report.[6]

---

[5] The State's burden was not to rebut appellant's position that he had a valid grievance. *Cf. post*, at 2.

[6] Our dissenting colleague argues that the jury could have disbelieved appellant's testimony. *Post*, at 4. But the ability to disbelieve testimony showing that the State did not meet its burden on the *Wood* elements does not create contrary evidence meeting that burden. As explained below, such evidence is lacking here.

9

Even crediting Officer Kiamar's testimony that appellant did not provide a copy of the December 29 letter, Kiamar acknowledged that appellant gave him (1) Equifax's notice to appellant; (2) appellant's letter to Equifax stating that he never applied for employment in Tennessee and requesting more information; and (3) appellant's December 27 letter to Captain Donoho in Tennessee. The December 27 letter states:

> I recently received the following notice from Equifax. As you can see, it appears someone from the T[ennessee] Highway Patrol has accessed my credit report, Dec. 16, 2011, stating that I was applying for employment with your agency. I've called Equifax and they will be providing me, via mail, with a detailed report showing who specifically requested this information.

All parties agree that appellant never applied for employment in Tennessee. In the December 27 letter, appellant goes on to say that "I've filed a complaint with the FTC who is looking into the matter . . . . The FTC has also instructed me to file this complaint with your office as well as the Attorney General's office for Identity Theft/Fraud as well as violating my right to privacy."[7]

On March 14, 2012, Captain Donoho sent appellant a letter stating the result of the investigation concerning his credit report. The letter states that appellant's complaint was "sustained" and that appropriate disciplinary action was taken against the officers involved. Donoho confirmed at trial that appellant's "credit history was not r[u]n properly" and that the officer who requested it had "circumvented the rules."[8]

The trial record thus shows uncontroverted evidence that appellant's credit

---

[7] As noted above, Officer Kiamar testified that Galveston Police Department policy is also to refer individuals to the FTC.

[8] Nothing in the record indicates that appellant's report was accidentally obtained in an improper manner. Captain Donoho testified that appellant's credit was not obtained accidentally.

report was improperly obtained by employees of the Tennessee Department of Safety who were later disciplined for their actions. No witness testified otherwise. The State failed to produce any evidence that appellant's report was nevertheless invalid. We therefore conclude the State failed to meet its burden to prove that appellant's representations were made in bad faith and for reasons other than to obtain action on a valid grievance.

This failure is not surprising given that, under federal law, the State of Tennessee did not have the authority to obtain appellant's credit report. Nothing in the Fair Credit Reporting Act, of which the trial court took judicial notice, permitted the Tennessee prosecutors to access appellant's credit report. In particular, 15 U.S.C. § 1681b(a) contains an exclusive list of the circumstances under which a consumer reporting agency may furnish a report. The only portion of the section potentially applicable on these facts provides that a consumer reporting agency may furnish a report in "response to the order of a court having jurisdiction to issue such an order, or a subpoena issued in connection with proceedings before a Federal grand jury." 15 U.S.C.A. § 1681b(a)(1) (West, Westlaw through 2015). No court order or subpoena authorizing Tennessee law enforcement officials to obtain appellant's report was presented at trial, and none appears in our record.[9]

The State argues that when appellant made his report to Officer Kiamar on January 5, he knew his credit had been checked by someone in the Tennessee

---

[9] Our dissenting colleague contends that Officer Kiamar testified this statute did not change his opinion that appellant's report was false. *Post*, at 3. In fact, Kiamar testified that the statute did not change his prior testimony regarding whether a violation of law had occurred, which was that "I didn't say there was no violation of law" in running appellant's credit. Yet even if Kiamar's testimony could be read as addressing falsity, as the dissent contends, that would not provide sufficient evidence on the separate element that appellant's underlying grievance was not valid.

11

Department of Safety due to a request from the attorney prosecuting his criminal case. The State asserts the December 29 letter establishes that appellant knew who ran his credit a few days before he reported identity theft or fraud. The State further directs us to Kiamar's testimony (which appellant disputed) that appellant did not provide him with the December 29 letter when they met on January 5 and that had this letter been provided, Kiamar would not have filed a report of identity theft.

Yet nothing in the December 29 letter shows appellant's grievance was invalid. The letter merely provides more context for appellant's complaint. It contains additional evidence about who requested the credit report and why, but it does not show that appellant's credit information was obtained properly. Although the letter shows that appellant knew his credit report was obtained by someone in a government department in Tennessee, he also knew his credit report had been obtained for employment purposes and that he had not applied for employment in Tennessee. And as indicated above, Captain Donoho's investigation concluded—with the benefit of the information in the December 29 letter—that appellant's grievance should be sustained. Any failure by appellant to provide the December 29 letter to Officer Kiamar therefore does not demonstrate that appellant acted in bad faith or that his grievance was invalid.

Additionally, it is undisputed that appellant did not know the identity of the person who had improperly checked his credit report at the time he filed his report with Kiamar. Appellant testified—and the December 29 letter reiterated—that he sought to file a report with the police because he was instructed to do so by the FTC. The State needed to prove beyond a reasonable doubt that appellant nevertheless filed a report in bad faith and for reasons other than to obtain action on a valid grievance, but it did not present any evidence on this point. That

appellant knew the department for which the person who checked his credit worked is not evidence that appellant filed a report in bad faith and for reasons other than to obtain action on a valid grievance in light of the unchallenged evidence that his credit report was improperly obtained.

We also note that Kiamar testified that law enforcement officers normally do not prosecute individuals for filing a false report if they are mistaken about whether a crime has been committed or if they use incorrect terminology to describe a crime. If appellant used an improper term to describe the wrongdoing of the Tennessee personnel who improperly obtained his credit report, that is not evidence that appellant made his representations in bad faith or for reasons other than to obtain action on a valid grievance. To protect the right to petition for redress of grievances, courts should not apply a standard that would subject individuals to prosecution if they fail to correctly identify an offense, if any, during their initial conversation with law enforcement officers.

The State also argues that the jury could have concluded appellant made his police report not to obtain action on a valid grievance, but solely to further previous complaints he had filed against the Tennessee troopers who arrested him following the traffic stop nine months earlier. Our dissenting colleague agrees with the State and points out that appellant's previous complaints were determined to be unfounded. *Post*, at 4. It is undisputed, however, that appellant's credit was checked improperly and that Captain Donoho's investigation sustained appellant's complaint regarding the check. Furthermore, there is no evidence that the troopers who arrested appellant were involved in improperly checking his credit, and thus no evidence that appellant's report of the check would further unrelated complaints against those troopers or otherwise provide appellant with leverage in his Tennessee criminal case. We therefore conclude that the State failed to offer

13

evidence that appellant's grievance was not a reason for his report to Officer Kiamar.

The dissenting opinion argues that our reasoning is flawed because we treat appellant as reporting a violation of 15 U.S.C. § 1681b(a) even though he reported that he was a victim of identity theft. *Post*, at 2. We disagree with this characterization. Our decision is based on all of the information appellant provided to Officer Kiamar on January 5 in making his report of "Identity Theft/Fraud," including the letters showing that appellant's credit was checked for employment purposes and that appellant had not applied for employment. Section 1681b(a) simply corroborates the evidence (discussed above) that the credit-check grievance underlying appellant's report was a valid one.

Bypassing the information appellant provided and the absence of any offense in the Texas Penal Code entitled "Identity Theft," the dissenting opinion treats appellant's grievance as a bare report that the elements of an offense the dissent deems similar to identity theft occurred. *Post*, at 2 & n.1. We cannot agree with this treatment, or with the dissent's conclusion that all the State needed to do to invalidate appellant's grievance was to provide testimony that appellant knew at least one of the elements was false. *Id.* at 2–3. As explained above, when the State alleges that a defendant made a false report concerning official misconduct, it must prove not only that the defendant made a knowingly false statement but also that he did so in bad faith and for reasons other than to obtain action on a valid grievance. *Wood*, 577 S.W.2d at 480. The dissent's view that a knowingly false statement in a report is sufficient to invalidate the grievance underlying the report would nullify the bad faith and non-grievance requirements as separate elements that the State must prove. Even if we had the authority to erase *Wood*'s holding requiring proof of these elements, which we do not, we would decline to do so

14

given the importance of the constitutional right to petition that these separate elements are intended to protect. *Id.* at 479–80.

Finally, we disagree with the dissent's suggestion that a grievance against official misconduct is valid only when the conduct satisfies all the elements of a criminal offense or a civil cause of action. *Post*, at 4. Officials can violate statutes or policies without committing a crime or becoming liable for damages, and the Constitution protects citizens' rights to complain of and seek redress for those violations—even if that redress is nothing more than discipline and instruction to comply with the law or policy in the future. In *Wood*, the defendant made a complaint to the Irving Police Department accusing an officer of being intoxicated while on duty. 577 S.W.2d at 478. The defendant did not report a crime but rather "attempt[ed] to obtain redress for what she arguably perceived as official misconduct." *Id.* at 479. That is precisely what the evidence shows happened in this case.

In sum, because the State failed to introduce any evidence—let alone sufficient evidence from which a rational juror could conclude beyond a reasonable doubt—that appellant made his report in bad faith and for reasons other than to obtain action on a valid grievance, we conclude the evidence is legally insufficient to support his conviction. We sustain appellant's second issue.[10]

---

[10] Because we reverse and render judgment on this issue, we need not address appellant's first issue, which seeks a new trial based on the trial court's failure to submit the question of materiality to the jury. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.")

## CONCLUSION

Having sustained appellant's second issue, we reverse the judgment of the trial court and render a judgment of acquittal.

/s/    J. Brett Busby
          Justice

Panel consists of Justices Christopher, Busby, and Brown (Christopher, J., dissenting).
Publish — TEX. R. APP. P. 47.2(b).

16