**Opinion issued December 31, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-22-00328-CR**

———————————

**LESTER FISHER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 178th District Court**
**Harris County, Texas**
**Trial Court Case No. 1695907**

---

## MEMORANDUM OPINION

Lester Fisher appeals his conviction for capital murder.[1] Fisher raises three issues: (1) there was insufficient evidence to support his conviction; (2) a mistrial should have been granted because he did not get to cross-examine one of the State's

---

[1] *See* TEX. PENAL CODE § 19.03(a)(2).

witnesses; and (3) the jury should have been instructed on defense of another. Because there was sufficient evidence, the trial court had discretion to deny a mistrial, and Fisher was not entitled to the requested jury instruction, we affirm.

## Background

In the early morning of October 25, 2020, E. Sparrow was parking his Buick at an apartment complex. Lester Fisher and Terrance Ballet, Jr., "T.J.," were waiting nearby. They were armed and looking to "hit a lick," a slang term for robbery.[2] T.J. approached Sparrow's Buick, and soon after there was a shootout between Fisher and T.J. and the occupants of the Buick. Fisher and T.J. fled.

Lieutenant P. Bruce of the Harris County Sherriff's Office responded to calls about a shooting. Lt. Bruce was the first to arrive on scene and found Sparrow laying on the ground. Sparrow had ten gunshot wounds and died shortly after EMS arrived. Two other deputies arrived later and began identifying and interviewing witnesses. Lt. Bruce and another deputy headed to the front of the complex, where they noticed a heavy trail of blood. They followed the trail up to the front gate and saw a large pool of blood. Near the outside of the gate, the deputy found T.J.'s body with a bullet wound that penetrated his femoral artery and a handgun.

---

[2] Investigator J. Viramontes testified that "hit a lick" was a common phrase meaning to commit a robbery. *Cf. Lewis v. State*, 448 S.W.3d 138, 145 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (recognizing hitting a lick as a euphemism for robbery or burglary).

Investigator M. McElvany, with the Crime Scene Unit of the Harris County Sheriff's Office, was assigned as the lead investigator. Two other CSU investigators assisted McElvany—Investigators Culp and Henneke. Investigator Culp collected blood samples, and Investigator Henneke collected other evidence and created a scene video. Deputy J. Reinert gathered the surveillance footage of the apartment complex. Deputy D. Crain also assisted with the investigation along with Deputy J. Viramontes. Deputy Crain went to the hospital for information about Sparrow's body. He noted that Sparrow was deceased and had multiple gunshot wounds to his torso and one to his right leg.

A. Stewart testified that she was dating and living with T.J. at the time. T. Batiste, T.J.'s cousin, also lived with them. The evening before the shootout, Stewart had picked up T.J. and gone home, but soon after T.J. went out again. In the early hours of the day of the shootout, Batiste called Stewart and told her that something had happened to T.J. Batiste went to meet Stewart, and then Stewart drove them to the scene. By the time they arrived, police were there, and they could not find T.J. A police officer followed them as they left and spoke to them when they stopped at a gas station. During the officer's questioning, Stewart learned that T.J. had been killed.

Later that day, Stewart spoke to a man she knew as "Red." Stewart had never met or spoken to Red before. Red told her that "T.J. was trying to hit a lick and it

3

went bad." Red explained that he was at the apartment complex when the shootout happened but had not been a part of it. Red said that "T.J. went up to [a] car and tried to open the door, and . . . the person in the car . . . shot T.J." Red did not say whether he or T.J. were armed, but Stewart assumed Red was after she learned someone else had been shot at the scene. Stewart had no further contact with Red or Batiste.

T.J.'s father testified that on October 25, 2020, Batiste called him. Based on what he learned from that call, he went to Houston with his wife. They drove directly to the scene and spoke with detectives. He also spoke with a person he later learned was Fisher. He was told that Batiste was "selling cat" in Houston, which he knew meant engaging in prostitution. Fisher also said that T.J. was "making bad moves," and that he was with T.J. when T.J. was hitting a lick. Fisher explained that he helped T.J. after he was shot, and he made sure that the people involved in T.J.'s death were "taken care of." T.J.'s father believed that if T.J. was robbing someone, T.J. would have had a gun with him. Based on what Fisher told him, T.J.'s father believed that Batiste set T.J. up. He also believed that someone in the Buick shot T.J., and then Fisher shot that man to help T.J.

In January 2021, Fisher was indicted for capital murder for the murder of Sparrow. He pleaded not guilty. After a trial, the jury found him guilty, and he was sentenced to life imprisonment without parole. This appeal followed.

4

## Sufficiency of the Evidence

Fisher contends that the evidence cannot support his conviction if the jury followed the trial judge's instruction not to consider Batiste's testimony. Fisher specifically argues that there was insufficient evidence to show that he was committing or attempting to rob Sparrow or that he intended to cause Sparrow's death. The State argues that Fisher's statements, surveillance footage, and the physical and medical evidence from the shooting support the conviction.

### A.    Standard of Review

We review the legal sufficiency of the evidence by considering all the evidence, in the light most favorable to the jury's verdict, to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We defer to the factfinder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. Our role is that of a due process safeguard, and we consider only whether the factfinder reached a rational decision. *See Malbrough v. State*, 612 S.W.3d 537, 559 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd); *see also Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (reviewing court's role "is restricted to guarding against the rare occurrence when a fact finder does not act rationally").

"In reviewing the legal sufficiency of the evidence, a court must consider both direct and circumstantial evidence, and any reasonable inferences that may be drawn from the evidence." *Malbrough*, 612 S.W.3d at 559; *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Circumstantial and direct evidence are equally probative in proving the defendant's guilt, and circumstantial evidence alone can be enough. *Malbrough*, 612 S.W.3d at 559. "For evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with a defendant's guilt." *Id.* The appellate court "considers only whether the inferences necessary to establish guilt are reasonable based on the cumulative force of all the evidence when considered in the light most favorable to the jury's verdict." *Id.* We review factual sufficiency of the evidence under the same standard of review as legal sufficiency. *See Edwards v. State*, 497 S.W.3d 147, 156–57 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd).

## B.    Analysis

A person commits capital murder if he "intentionally or knowingly causes the death of an individual" and "intentionally commits the murder in the course of committing or attempting to commit . . . robbery." TEX. PENAL CODE §§ 19.02(b)(1), .03(a)(2). A person commits robbery "if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally or knowingly threatens or places another in fear of imminent

6

bodily injury or death." *Id.* § 29.02(a)(2). A person commits theft if he "unlawfully appropriates property with intent to deprive the owner of property." *Id.* § 31.03(a). The State alleged that Fisher committed capital murder by shooting Sparrow with a firearm while committing or attempting to commit robbery.

Direct evidence of the elements of the offense, including the identity of the perpetrator and a culpable mental state, is not required. *Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007). The jury may infer intent from any evidence that it believes proves that intent. *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). This includes a person's acts, words, and conduct, as well as the use of a deadly weapon. *Galvan-Cerna v. State*, 509 S.W.3d 398, 404 (Tex. App.—Houston [1st Dist.] 2014, no pet.). A handgun is a deadly weapon per se. TEX. PENAL CODE § 1.07(a)(17)(A). "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both." *Id.* § 7.01(a).

The trial court instructed the jury on the law of parties under Penal Code Section 7.02(a)(2) and the law of conspiracy under Penal Code Section 7.02(b). *See id.* § 7.02(a)(2), (b). "A person is criminally responsible for an offense committed by the conduct of another if, . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *See id.* § 7.02(a). If, in the attempt to carry

7

out a conspiracy to commit one felony, like robbery, another felony, like capital murder, is committed by one of the conspirators, all conspirators are guilty of the capital murder actually committed, even if they had no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. *See id.* § 7.02(b).

The evidence shows that a black Jeep entered the apartment complex at 4:17 a.m. and traveled to Building 8, where it dropped people off before leaving at 4:21 a.m. At the same time, Sparrow's gold Buick entered the complex. Two individuals can be seen leaving Building 8 and heading to Building 16's parking lot, where the Buick was located. Shortly after, the surveillance footage captured a barrage of gunfire aimed in the Buick's direction.

The jury also heard three audio recordings of T.J.'s father talking to Fisher about the incident. In the longest audio recording, Fisher admits that he took part in the "lick" as T.J.'s partner, that he was not going to let any of the people who shot T.J. leave, that he "took care of them" and "laid [them] out," and that neither of those people made it out because they got "worked" by a .40-caliber handgun. Fisher also told T.J.'s father that he got rid of his phone that had messages between him and T.J.

Stewart testified that Fisher told her that he and T.J. were trying to hit a lick, but it went bad, and T.J. did not make it. Fisher told Stewart that T.J. had gone up to

8

the vehicle and tried to open the vehicle's door before the person inside lowered the window and shot T.J. Stewart also said that Fisher shot another person.

The police found two types of cartridge casings at the scene—nine-millimeter casings near the Buick in the parking lot and .40-caliber casings in the grassy area behind the Buick. No other caliber of cartridges was found. A nine-millimeter handgun was found next to T.J.'s body. No weapon was found near Sparrow.

Bullet strikes, fragments, and projectiles were found in and around the Buick and the surrounding vehicles. A bullet strike and projectile were found in an apartment west of the parking lot. Deputy McElvany testified the casings and bullet strikes were consistent with shots coming from behind or in front of the vehicle. Inside Stewart's apartment, there was a plastic bag with seven cartridge cases, another nine-millimeter cartridge, and a loaded 12-round Glock .40-caliber pistol magazine.

Dr. N. Barna, the medical examiner who autopsied Sparrow, testified that Sparrow's injuries were consistent with being caused by a firearm and that he could not have survived the ten gunshot wounds on his body. Based on his analysis, Dr. Barna determined that one was a contact wound (within a few inches), two were done at close range (closer than two or three feet), three from intermediate range (about two to three feet away), and four from an undetermined range.

Dr. R. Pipkin, a firearms examiner with the Harris County Institute of Forensic Sciences, testified that the five nine-millimeter cartridge cases tested came from the handgun found near T.J. She also testified that an unknown firearm fired the six .40-caliber cartridge cases found at the scene. There was also a bullet and bullet fragments that could not be identified as having been fired by either gun but could not have been fired by the nine-millimeter handgun found near T.J. Additionally, there were at least two more firearms at the scene beside the nine-millimeter handgun.

Viewing the evidence in the light most favorable to the conviction, the evidence is sufficient to find that Fisher intended to kill Sparrow. A culpable mental state is generally inferred from the circumstances. *Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018). We infer his mental state from his "acts, words and conduct." *Galvan-Cerna*, 509 S.W.3d at 404. Fisher admitted he was not going to let the people inside the Buick leave and that he "took care" of them, explaining that he "laid [them] out" and they got "worked" by a .40-caliber handgun. The jury could infer specific intent to kill from the use of a deadly weapon, the number of gunshot wounds, and the extent of the injuries. *See Nisbett*, 552 S.W.3d at 267 (mental state may be inferred from victim's injuries); *Motilla v. State*, 78 S.W.3d 352, 359 (Tex. Crim. App. 2002) (decision to fire multiple times is evidence of intent to kill); *Felder v. State*, 848 S.W.2d 85, 90 (Tex. Crim. App. 1992) (intent to fatally harm apparent

10

from number and location of wounds); *Hollins v. State*, No. 01-14-00744-CR, 2015 WL 5076298, at \*4 (Tex. App.—Houston [1st Dist.] Aug. 27, 2015, pet. ref'd) (mem. op., not designated for publication) (jury may infer intent to kill from use of deadly weapon). Fisher's mental state can also be inferred from his admission that he got rid of the phone that contained messages between him and T.J. *See Nisbett*, 552 S.W.3d at 267 (jury may infer mental state from circumstances); *Galvan-Cerna*, 509 S.W.3d at 404 (inferring mental state from "words, acts and conduct").

Contrary to Fisher's suggestion, the State did not have to prove that Fisher completed the robbery; the jury could infer the intent to rob from the circumstantial evidence. *Robertson v. State*, 871 S.W.2d 701, 705 (Tex. Crim. App. 1994) (State must only show that intent to commit robbery was formed before or at same time as murder). So we are only to determine whether any rational factfinder could find beyond a reasonable doubt from the evidence that Fisher formed the intent to take Sparrow's property before or at the time of his murder. *See id.*

Investigator Viramontes testified that "hit a lick" means to commit a robbery. Fisher admitted having hit "licks" with T.J. before and described himself as T.J.'s partner when doing so. When he talked to T.J.'s father, Fisher explained that he and T.J. were not supposed to "hit the lick" until another person returned to the apartment complex because that person had a car. Stewart also testified that Red told her that "T.J. was trying to hit a lick and it went bad."

11

Fisher argues that without Batiste's testimony, none of his conversation with T.J.'s father makes sense. We disagree. It is clear from Fisher's call with T.J.'s father that they were discussing the robbery during which T.J. and Sparrow died. T.J.'s father had called Fisher wanting closure about what happened to T.J. This is why Fisher explained that he was hitting a lick with T.J. and that it had gone wrong.

It was the jury's responsibility to assess the credibility of the witnesses and weigh the evidence. *See Canfield v. State*, 429 S.W.3d 54, 65 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). In doing so, the jury was free to disbelieve any the evidence. *See id.* Viewing the evidence in the light most favorable to the verdict, the jury could have rationally inferred that Fisher decided to rob Sparrow either before or during the murder. *See Lewis v. State*, 448 S.W.3d 138, 145 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *Baimba v. State*, No. 01-19-00178-CR, 2020 WL 7250330, at *3 (Tex. App.—Houston [1st Dist.] Dec. 10, 2020, no pet.) (mem. op., not designated for publication).

We therefore hold that the State presented sufficient evidence from which a rational jury could conclude, beyond a reasonable doubt, that Fisher intended to kill Sparrow while committing robbery and thus committed capital murder. *See* TEX. PENAL CODE § 19.03(a)(2).

We overrule Fisher's second issue.

12

**Denial of Mistrial**

Fisher contends that the trial court erred by denying a mistrial when Batiste, after a lengthy direct examination, invoked her Fifth Amendment right not to incriminate herself after cross-examination began and the defense had asked her over 50 questions. Fisher argues that Batiste's testimony was so damaging that it could not be corrected with an instruction to disregard because there was no other evidence implicating Fisher in Sparrow's murder. The State argues that the prejudicial effect of Batiste's testimony was minimal because of the corrective measures taken by the trial court along with the remaining evidence supporting the conviction.

## A. Standard of Review

"A mistrial is an appropriate remedy in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). When the trial court sustains an objection and instructs the jury to disregard the objected-to evidence but then denies a mistrial, the issue is whether the trial court abused its discretion by denying the mistrial. *Archie v. State*, 340 S.W.3d 734, 738–39 (Tex. Crim. App. 2011) (citing *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)). An appellate court views the evidence in the light most favorable to the trial court's ruling, considering only those arguments before the trial court at the time of its ruling. *Ocon*, 284 S.W.3d at 884 (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)). The ruling must be upheld

if it was within the zone of reasonable disagreement. *Id.* Only in the extreme circumstances where the prejudice is incurable is a mistrial required. *Hawkins*, 135 S.W.3d at 77; *Ocon*, 284 S.W.3d at 884–85.

**B.    Analysis**

Fisher argues that it was impossible for the jury to not consider Batiste's testimony implicating him in Sparrow's murder. Batiste testified that she moved to Houston in 2019 into an apartment with a man she knew as "K" and his girlfriend. Sometimes T.J. stayed at the apartment. On the night of the incident, she was at the apartment with T.J., K, and K's girlfriend. They all went to eat at Waffle House and then returned to the apartment. Batiste went inside and was followed by K, his girlfriend, T.J., and Red. Batiste identified Red as Fisher. Batiste went to bed but soon heard gunshots. When she went outside to see what was going on, she noticed a body. She went back inside the apartment, ran to the balcony, and saw someone jump a fence. Fisher then ran into the apartment and told her she needed to go find T.J. because he had been shot. Fisher told her that they had gone to hit a lick but the man that T.J. was talking to ended up shooting T.J., so Fisher then shot the passenger and driver of the vehicle. Batiste then tried to get ahold of Stewart and was given a ride by K and his girlfriend. Batiste rode with Stewart back to the apartment complex to try to find T.J. After they could not locate T.J., they left and were followed by a police officer to a nearby gas station. At the gas station, Batiste was questioned by

14

the police but disclose what she knew. Batiste and Stewart returned to Stewart's home where Batiste waited to be picked up by her mother. After realizing she left her ID in K's vehicle, Batiste, her mother, and her mother's boyfriend met up with K to retrieve it before heading straight to Batiste's mother's house in Louisiana.

Fisher specifically complains of being denied the opportunity to challenge Batiste's testimony that he and T.J. "went and hit a lick" when "a guy ended up shooting T.J. in the leg" and then Fisher "ended up shooting the guy in the passenger seat" and then going "back around and kill[ing] the driver."

A mistrial is appropriate when the objectionable events are so emotionally inflammatory that curative instructions are unlikely to prevent the jury from being unfairly prejudiced against the defendant. *See Young v. State*, 137 S.W.3d 65, 71 (Tex. Crim. App. 2004); *see also Ocon*, 284 S.W.3d at 884 ("Whether an error requires a mistrial must be determined by the particular facts of the case."). When determining whether the trial court abused its discretion in denying a mistrial, we balance (1) the prejudicial effect, (2) the curative measures taken, and (3) the strength of the evidence supporting the conviction. *See Archie*, 340 S.W.3d at 739 (referring to the *Mosley* factors from *Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998) and extending them to evaluation of improper jury argument that violated a defendant's constitutional rights). The question is whether, balancing the *Mosley* factors, the trial court abused its discretion by denying a mistrial.

15

The first *Mosley* factor looks at the magnitude of the prejudicial effect of Batiste's testimony. *See Hawkins*, 135 S.W.3d at 77 (prejudice is the touchstone of the first factor). When a defendant is not allowed to fully cross-examine the State's witness, a possible Sixth Amendment violation occurs, since cross-examination is "implicit within the right to confrontation." *Keller v. State*, 662 S.W.2d 362, 364 (Tex. Crim. App. 1984); *see also Lopez v. State*, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000) ("A primary interest secured by the Confrontation Clause is the right of cross-examination."). Batiste testified that Fisher told her that he and T.J. went to "hit a lick" and that after T.J. was shot, Fisher shot the Buick passenger and driver. Batiste testified at the end of the second day of trial and was the last witness the jury heard before adjourning that day. It was not until the next day, when Batiste underwent further cross-examination, that she asserted her Fifth Amendment right, and the trial court instructed the jury to disregard her testimony. Because the jury heard direct evidence that Fisher admitted shooting two people in the Buick and could consider that information until being instructed to the contrary at the end of the next day, the effect was significant in severity and magnitude. *See Walker v. State*, 610 S.W.2d 481, 484 n.6 (Tex. Crim. App. 1980) (citing *Dunn v. United States*, 307 F.2d 883, 886 (5th Cir. 1962) (Gewin, J.) ("[O]ne cannot 'unring a bell'; 'after the thrust of the saber it is difficult to say forget the wound.'")); *see also Hughes v. State*, 4 S.W.3d 1, 7 (Tex. Crim. App. 1999) (describing witness's

16

testimony about defendant's confession as highly prejudicial). Thus, the importance of Batiste's testimony and the delay in instructing the jury to disregard it weighs in favor of finding an abuse of discretion.

Under the second *Mosley* factor, we consider the curative measures taken. The trial court instructed the jury to disregard all Batiste's testimony. *See Bryan v. State*, No. 02-19-00408-CR, 2021 WL 1685951, at *2 (Tex. App. —Fort Worth Apr. 29, 2021, no pet.) (mem. op., not designated for publication) (common remedy when witness asserts their Fifth Amendment right on cross-examination is to strike witness's direct testimony and instruct jury to disregard it); *Villegas v. State*, 791 S.W.2d 226, 234 (Tex. App.—Corpus Christi 1990, pet. ref'd) (usual remedy when State witness asserts Fifth Amendment right on cross-examination on matters witness testified to on direct-examination is to strike witness's direct testimony); *see also Gordillo v. State*, No. 01-13-00477-CR, 2015 WL 730593, at *3 (Tex. App.—Houston [1st Dist.] Feb. 19, 2015, no pet.) (mem. op., not designated for publication) (citing *Fountain v. United States*, 384 F.2d 624, 628 (5th Cir. 1967) (when witness asserts Fifth Amendment right against self-incrimination on cross-examination, that witness's direct testimony may be stricken)). The trial court also repeated the instruction in the jury charge, directing the jurors "to disregard any and all testimony of . . . Batiste . . . [and] not to consider it for any purpose during your deliberations."

17

We must presume the jury follows the trial court's instructions. *Gonzalez v. State*, 522 S.W.3d 48, 64 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (citing *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005)). The presumption is rebuttable, but Fisher must point to evidence that the jury failed to follow the trial court's instructions. *Thrift*, 176 S.W.3d at 224.

Fisher stresses that Batiste was referenced multiple times—after her testimony was struck—during other witness testimony and the State's closing argument. The State asked the jury, "why does [Fisher] threaten [Batiste]? Because he knows in his mind that she's the only witness that can put him at the scene where this occurred." While the State was referring to the phone conversation between Fisher and T.J.'s father, it highlights that Batiste was crucial to the case against Fisher. Fisher asserts that the repeated evocation of Batiste led the jury to consider her stricken testimony. But Fisher's only evidence that the jury considered Batiste's testimony is that he was convicted of capital murder, which he asserts was unsupported by the evidence absent Batiste's testimony. As discussed above, we disagree. Because this is the only evidence Fisher has raised, we cannot agree that the presumption has been rebutted. *See Jones v. State*, 264 S.W.3d 26, 30 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998) (presuming jury followed trial court's instruction after not moving for new trial

18

alleging juror misconduct, nor obtaining a hearing to adduce facts not in the record). This weighs against finding an abuse of discretion.

Under the third *Mosley* factor, we consider the strength of the evidence supporting the conviction. The jury heard the conversation between Fisher and T.J.'s father wherein Fisher admitted that he "took care" of the people inside the Buick, explaining they were "laid out" and got "worked" by a .40-caliber handgun. The jury also heard Stewart's testimony that "Red" told her he was with T.J. trying to hit a lick that night, but it went bad. We find the evidence that remained absent Batiste's testimony compelling. Even if the jury doubted that Red was the same person as Fisher or that Fisher was honest with T.J.'s father, the jury could have weighed the testimony and believed some but not all of the conversation between Fisher and T.J.'s father. *See Archie*, 340 S.W.3d at 742; *see also Williams*, 235 S.W.3d at 750 (jury gets to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences). This weighs against finding an abuse of discretion.

While Batiste's testimony was highly prejudicial, there was no evidence that the jury disobeyed the trial court's instructions to disregard the testimony. And Batiste's testimony was not the only evidence that Fisher killed the Buick's occupants—Fisher himself alluded to this multiple times in his conversation with T.J.'s father. Therefore, we hold that the trial court had discretion to deny the motion for mistrial. *See Archie*, 340 S.W.3d at 742.

19

We overrule Fisher's first issue.

## Jury Instruction on Defense

Fisher contends that he was entitled to a jury instruction on defense of another because the evidence showed that he was defending T.J. after T.J. was shot. The State argues that Fisher was not entitled to such an instruction because the use of force was not justified.

### A.    Standard of Review

We review the trial court's decision denying a request for a defensive instruction for an abuse of discretion, viewing the evidence in the light most favorable to the defendant's requested submission. *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). Our review of jury charge error is a two-step process, first considering whether error exists, and if it does, then considering whether there was harm. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). The degree of harm necessary for reversal depends on whether the defendant preserved error by objection. *Id.* Jury charge error requires reversal when the defendant has properly objected to the charge and the reviewing court finds some harm to his rights. *Id.*; *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1994) (op. on reh'g). The record must show actual harm and not just a theoretical complaint. *Cornet v. State*, 417 S.W.3d 446, 450 (Tex. Crim. App. 2013). The "some

harm" standard means "that any harm, regardless of degree, is sufficient to require reversal." *Druery v. State*, 225 S.W.3d 491, 504 (Tex. Crim. App. 2007).

**B.    Analysis**

The trial court must deliver a written charge setting forth the law that applies to the case. TEX. CODE CRIM. PROC. art. 36.14. A defendant is entitled to a jury instruction on a defensive issue if the issue is raised by the evidence, whether that evidence is strong or weak, unimpeached or contradicted, and no matter what the trial court may think about the credibility of the defense. *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001). "Raised by the evidence" means "there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that th[e] element is true." *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007).

Section 9.33 of the Penal Code provides that a person is justified in using force against another to protect a third person if:

> (1) under the circumstances as the actor reasonably believes them to be, the actor would be justified . . . in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and
>
> (2) the actor reasonably believes that his intervention is immediately necessary to protect the third person.

TEX. PENAL CODE § 9.33. But when the evidence establishes as a matter of law that force is not justified in self-defense, no instruction is required. *Coble v. State*, 871 S.W.2d 192, 202 (Tex. Crim. App. 1993).

Fisher was charged with capital murder where robbery was an element. TEX. PENAL CODE § 19.03(a)(2). To consider an instruction on self-defense, the jury would have to find that Fisher or T.J. were committing a robbery. So a self-defense instruction was unwarranted. *Toliver v. State*, No. 01-87-00591-CR, 1988 WL 15126, at *1 (Tex. App.—Houston [1st Dist.] Feb. 25, 1988, pet. ref'd) (not designated for publication) ("[A] robber has no right of self-defense against his intended victim."). Although a defendant is entitled to an instruction on any defensive matter raised by the evidence, a defendant may not claim self-defense in a robbery cas. *Evans v. State*, 601 S.W.2d 943, 946 (Tex. Crim. App. 1980); *Davis v. State*, 597 S.W.2d 358, 360 (Tex. Crim. App. 1980). Therefore, the trial court did not abuse its discretion in denying Fisher's requested jury instruction.

We overrule Fisher's third issue.

## Conclusion

We affirm the trial court's judgment.

Sarah Beth Landau
Justice

Panel consists of Justices Landau, Countiss, and Guerra.

Do not publish. TEX. R. APP. P. 47.2(b).