Opinion issued February 3, 2026



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-24-00122-CR

_____

**WILLIAM DELAWRENCE LEWIS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 176th District Court**
**Harris County, Texas**
**Trial Court Case No. 1727982**

---

## MEMORANDUM OPINION

A jury found Appellant William Delawrence Lewis guilty of failure to stop and render aid in an accident involving death, a second-degree felony. *See* TEX. TRANSP. CODE §§ 550.021, .023. The trial court entered judgment on the verdict and, based on an agreement with the State concerning punishment, imposed a

sentence of ten years' confinement, probated for a term of seven years, plus a $1,000 fine. Appellant contends the evidence is insufficient to support the jury's verdict. We affirm.

## Background

On June 19, 2021, Appellant was nineteen years old and had rented a gray Dodge Challenger for the weekend, which he described as a "pretty fast car" with "[a] little bit more than 700 horsepower." Shortly after 11:00 a.m. that day, Appellant was driving the Challenger alone northbound in the leftmost lane of Highway 288,[1] a four-lane freeway with a speed limit of sixty miles per hour. The weather was clear and sunny, and traffic was "moderate" such that Lane 1 was empty in front of Appellant for the foreseeable distance. At some point, Appellant began driving next to a black Kia K5. Both Appellant's Challenger and the Kia were traveling at high rates of speed, significantly faster than the general flow of traffic.

Fire Captain Laird was driving an ambulance on Highway 288 ahead of the Kia and Appellant's Challenger. Captain Laird first noticed the subject black and gray vehicles when he looked in his side mirror and saw them traveling side-by-side on the highway behind him. At that time, Captain Laird was driving seventy miles per hour. Captain Laird testified that both cars were moving at "an extremely high

---

[1]     We use the same lane designations as the parties used in the court below. Thus, we refer to the leftmost lane of the freeway as "Lane 1," the next lane over to the right as "Lane 2," the third lane over as "Lane 3," and so on.

2

rate of speed in comparison to . . . everybody else that was on the road." After a little more than a mile, the vehicles passed Captain Laird's ambulance on its left side so fast that he could not tell the vehicles' makes and models. Then, after almost half a mile, Captain Laird saw the black car crash after losing control and cutting directly in front of the gray car. Laird testified he never saw the gray vehicle attempt to disengage with the black vehicle but "pretty much kept at a constant pace with the black vehicle." Laird stated that the vehicles remained together at this fast pace for around a mile and a half.

Appellant testified the Kia pulled into Lane 2 next to his Challenger, then moved into Lane 3 to pass a vehicle that was in front of it, after which the Kia moved back toward Lane 1 where Appellant was driving. Apparently having lost control by that point, the Kia cut in front of Appellant's vehicle in such a manner that the Kia was coming directly at Appellant.

Immediately after it cut in front of Appellant's vehicle, the Kia crashed into a concrete barrier on the left side of the road and rolled over, throwing debris across the freeway and ejecting both occupants from the car. One of the Kia occupants died at the scene, and the other was severely injured and hospitalized for twenty-one days.

A video excerpt from Houston's TranStar freeway-monitoring system was introduced at trial and shows Appellant's Challenger and the Kia shortly before the accident, the accident itself, and the scene afterwards. Prior to the crash, the video

3

shows the Kia moving from Lane 2 into Lane 3 to pass another vehicle, then moving back toward Lane 2, cutting across Lane 1 directly in front of Appellant's Challenger, and crashing into the barrier on the left side of the highway.

The Kia's data recorder showed it was traveling at 124 miles per hour five seconds before its airbags deployed and 88.2 miles per hour at the time of deployment. The State's accident-reconstruction expert testified that the Kia was traveling at approximately 110 miles per hour when it hit the barrier and the Challenger was going "around 103 to 110 miles an hour" when the Kia cut in front of it. At the scene, Appellant told officers he had been driving at "65, 75" miles per hour. At trial, Appellant testified he was not sure of his real speed but estimated he was driving at approximately 80 miles per hour.

Whether the Kia struck the Challenger before crashing was contested at trial. The passenger side of the Challenger's front bumper had scratches and scuff marks after this incident that were not present before the incident. But whether that damage came from the Kia itself as it cut in front of the Challenger, or from debris thrown from the Kia after it crashed into the barrier, was disputed. The TranStar video does not show any noticeable contact between the two cars. Eyewitnesses of the incident did not mention any contact between the vehicles. Appellant testified he did not feel any impact to his vehicle. Appellant also testified that he was unaware at that point that his car had contacted anything and that he still does not know what caused the

4

damage. And the surviving occupant of the Kia testified she had no recollection of any contact between the vehicles.

Two officers who investigated the accident (but did not witness it) testified they believed the Challenger and the Kia made contact, based on the scratch marks on the Challenger's bumper. Officer Ho testified that his role in the post-accident investigation was limited to interviewing Appellant, that he was "not a part of" determining "how the crash happened," and that he would not "tell my opinion to the primary [investigator]" because "I'm not going to come up with my opinion on this because I might be wrong." However, Officer Ho also testified that the scratches on Appellant's bumper were caused by "another vehicle sideswipe" and could not have been from debris because "the paint showing the direction of the scratching . . . got dark and then lighter to the end of the scratches."

The second officer, the State's accident-reconstruction expert, testified that "the only way the damage could be sustained on the front right of that Dodge Challenger is that the Dodge Challenger strikes the Kia as it's sliding in front of him." However, on cross-examination, he testified the damage to the Challenger also could have been caused by striking debris, specifically the Kia's black fender.

After the crash, the Kia came to rest in Lanes 2 and 3. Captain Laird parked his ambulance to block traffic and assessed the occupants who had been thrown from the Kia. He notified his dispatcher that additional first-responder units were needed.

5

When the other units arrived, Captain Laird resumed transporting his original patient to the hospital. Other vehicles that were behind the accident also began to stop on the highway.

Appellant continued driving. Captain Laird testified he did not see the Challenger's brake lights come on. Appellant testified that, at this point, he did not know whether his "car ha[d] been hit," and he began moving toward Lane 4. By the time he reached Lane 4, Appellant had driven beyond the accident site and was "like an exit away" from where the Kia cut in front of him. He continued northward and exited the freeway at the second exit after the accident site. Appellant testified he was unable to stop immediately at the crash site and could not have stopped even if he had been aware his vehicle had been hit, "[b]ecause the situation that was happening" and "[b]ecause of the cars turning down the highway."

After exiting the freeway, Appellant parked his car and called his mother to "tell her what [he] just saw." He did not call 911. While he was speaking with his mother, Appellant exited the car and inspected it. He saw scratches on the bumper that had not been there before. He told his mother about the scratches, and she instructed him to return to the site of the accident. Appellant testified that the reason he inspected the car was that he "was just near an accident."

After speaking with his mother, Appellant traveled back toward the scene of the accident. Appellant testified that the route he used was "as reasonable and quick"

as he could return to the accident site. He pulled into a gas station, which he stated was "the closest point to the accident" he could get. Appellant testified he saw police officers near the gas station directing traffic. After two of the officers ignored him, Appellant approached a third officer who called a police unit to escort Appellant back to the accident site.

Appellant's mother, stepfather, and aunt, all of whom lived nearby, met him at the gas station. Appellant testified his family members arrived as he waited for the police escort. When the police unit arrived to escort Appellant, he and his family members followed the unit in the Challenger to the accident site.

When Appellant arrived at the site, Officer Ho interviewed him. Officer Ho's bodycam video shows that, as the interview begins, Appellant, Officer Ho, and another officer are walking around Appellant's Challenger. As they approach the front of the car, Appellant points to the front bumper and says, "got the bottom of it." As Appellant is describing the incident and the point at which the Kia cut in front of him, he says, "she started goin' faster, then the next thing you know the car just started going at a diagonal pace, right towards me, right towards me." As he said this, Appellant made a gesture with his hands, moving one past the other with his arms outstretched and brushing them together such that his palms made contact. He then pointed at his bumper and said, "whatever happened, it just went right across me," repeating the same clapping gesture.

7

When the other officer asked Appellant if the Kia had lost control, Appellant made a similar hand gesture and said, "that must have been what happened" because the Kia was moving diagonally across the freeway and then "came right across my face and then right into the grass." Officer Ho then asks Appellant if he lost control of his car. Appellant responds, "I didn't lose control. . . . I didn't know she hit me; that's why I came back."

After he finished with Officer Ho, another officer drove Appellant to a different area of the freeway, where he was arrested for racing. Appellant was indicted for racing on a highway and failing to stop and render aid. The jury acquitted Appellant of racing and found him guilty of failure to stop and render aid, and the trial court rendered judgment accordingly. Appellant now appeals.

**Analysis**

In a single issue, Appellant contends the evidence is insufficient to support his conviction for failure to stop and render aid ("FSRA").

**A.    Applicable law and standard of review**

At the time of the offense, the FSRA statute provided in relevant part:

> (a) The operator of a vehicle involved in an accident that results or is reasonably likely to result in injury to or death of a person shall:
>
> (1) immediately stop the vehicle at the scene of the accident or as close to the scene as possible;

8

(2) immediately return to the scene of the accident if the vehicle is not stopped at the scene of the accident;

(3) immediately determine whether a person is involved in the accident, and if a person is involved in the accident, whether that person requires aid; and

(4) remain at the scene of the accident until the operator complies with the requirements of Section 550.023 [requiring the operator to provide driver's license and insurance information and reasonable assistance].

TEX. TRANSP. CODE § 550.021(a).[2]

"Accident" is not statutorily defined and therefore bears its conventional meaning. *Curry v. State*, 569 S.W.3d 163, 167 (Tex. App.—Houston [1st Dist.] 2018) (citing TEX. GOV'T CODE § 311.011(a)), *rev'd on other grounds*, 622 S.W.3d 302 (Tex. Crim. App. 2019). "In general, the term encompasses any 'unfortunate incident that happens unexpectedly and unintentionally, typically resulting in damage or injury.'" *Id.* (quoting NEW OXFORD AMERICAN DICTIONARY 9 (3d ed. 2010)). "The term is equally broad in meaning, if not broader, in the context of automobile accidents." *Id.* (citing cases in which "accident" was held to include passengers jumping from defendants' vehicles).

---

[2] In 2023, the Legislature amended section 550.021 by replacing the word "accident" with "collision" throughout. *See* TEX. TRANSP. CODE § 550.021, *amended by* Acts 2023 88th Leg., ch. 709 (H.B. 2190), § 48, eff. Sept. 1, 2023.

Not only must the driver be involved in an accident, but also the driver must know[3] he was involved in the accident.  *Curry v. State*, 622 S.W.3d 302, 308 (Tex. Crim. App. 2019).  A driver does *not* have a duty to stop and render aid "if he does not know that he was involved in an accident."  *Id.* at 309.

The State is required to prove each essential element of an offense beyond a reasonable doubt.  *Baltimore v. State*, 689 S.W.3d 331, 340 (Tex. Crim. App. 2024); *see also Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979).  Sufficiency of the evidence "is measured by comparing the evidence produced at trial to 'the essential elements of the offense as defined by the hypothetically correct jury charge.'" *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).  We consider all of the admitted evidence and view it in the light most favorable to the verdict.  *Harrell v. State*, 620 S.W.3d 910, 913–14 (Tex. Crim. App. 2021); *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013).  We then determine whether "the cumulative force of all evidence," together with any reasonable inferences from it, could lead a rational juror to find that the State has proven the essential elements of the crime beyond a reasonable doubt.  *Baltimore*, 689 S.W.3d at 341; *see also Cary v. State*, 507 S.W.3d 761, 766 (Tex. Crim. App. 2016) (appellate court's role is not

---

[3] "A person acts knowingly, or with knowledge, with respect to . . . circumstances surrounding his conduct when he is aware . . . that the circumstances exist."  TEX. PENAL CODE § 6.03(b).

10

to act as additional juror but to ensure jury's verdict is rational and based on more than "a mere modicum of evidence").

As the sole factfinder, the jury may credit the witnesses it chooses, disbelieve any or all of the evidence or testimony offered, weigh the evidence, and reasonably infer facts from the evidence presented. *See Canfield v. State*, 429 S.W.3d 54, 65 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). In drawing these inferences, juries may "use common sense and apply common knowledge, observation, and experience gained in ordinary affairs." *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014). But juries may not "come to conclusions based on mere speculation or factually unsupported inferences or presumptions." *Baltimore*, 689 S.W.3d at 342.

**B. Sufficient evidence supports the jury's finding that Appellant violated the FSRA statute**

**1. The evidence is sufficient to support a finding Appellant knew he had been involved in a qualifying accident**

To obtain a conviction for violating the FSRA statute, one element the State was required to prove was that Appellant knew he was involved in an accident resulting in injury or death or that was reasonably likely to result in injury or death. *See* TEX. TRANSP. CODE § 551.021(a); *Curry*, 622 S.W.3d at 309. Appellant argues the evidence is insufficient to support this element. We disagree.

11

First, there was sufficient evidence for the jury to find that the accident was a qualifying accident. It is undisputed that the accident resulted in the death of one of the Kia's occupants and serious injury to the other. Appellant testified that when the Kia crashed into the freeway barrier, he saw the occupants being ejected from the car and "knew these two bodies probably would have been injured as a result of the crash" and would suffer "some pretty serious injuries."

Second, there was sufficient evidence for a rational jury to find that Appellant knew he was involved in the accident. Despite eyewitnesses stating they did not see contact between the two vehicles, and Appellant's testimony that he did not notice such contact, there was evidence the jury could believe that supports a finding he knew contact was made at the time the Kia passed in front of him. *See Canfield*, 429 S.W.3d at 65 (jury is free to disbelieve testimony and credit the witnesses it chooses).

After the incident, Appellant got off the highway two exits past the accident site, pulled over, called his mother to discuss the accident, and inspected the damage to the Challenger. The jury was free to believe Appellant did so because he knew the Kia had contacted his vehicle and he wanted to see what damage occurred. On the bodycam video, Appellant tells Officer Ho the Kia "started going at a diagonal pace, right towards me, right towards me," while simultaneously making a clapping-like gesture with his hands, holding his arms outstretched. Appellant then pointed at the damage to his bumper and said, "whatever happened, it just went right across

12

me," repeating the same clapping gesture that mimicked contact between the vehicles. Appellant did not tell officers that the damage could have been caused by debris following the Kia striking the barrier. Officer Ho testified that the scratches on Appellant's bumper were caused by "another vehicle sideswipe" and could not have been from debris because "the paint showing the direction of the scratching . . . got dark and then lighter to the end of the scratches."

Viewing the evidence in the light most favorable to the verdict, we conclude a rational jury could find that Appellant knew, at the time of the accident, that he had been involved in an accident that resulted in or was reasonably likely to result in injury or death.

### 2. The evidence is sufficient to support a finding that Appellant failed to stop and render aid immediately

Because the jury rationally found that Appellant knew he was involved in a qualifying accident under the FSRA statute, he was bound by the statute's stop-and-render-aid duties. *See* TEX. TRANSP. CODE § 550.021(a)(1)–(4); *Curry*, 622 S.W.3d at 308–09. Breaches of these different duties are "alternate methods of committing the same offense." *Huffman v. State*, 267 S.W.3d 902, 909 (Tex. Crim. App. 2008) (superseded by statute on other grounds). Appellant argues the evidence is insufficient to support a finding he violated any of these duties. Again, we disagree.

One of the duties requires a driver who knows he was involved in a qualifying accident to "immediately stop the vehicle at the scene of the accident or as close to

13

the scene as possible." TEX. TRANSP. CODE § 550.021(a)(1). Following the accident, Appellant drove to Lane 4, passed an exit, and then got off the highway at the next exit. The TranStar video shows there were ample places where Appellant could have stopped along the highway near the accident site instead of continuing to drive and eventually stopping in a parking lot off the highway. Appellant admitted at trial that "[i]t's fair to say that I wasn't near the accident anymore" when he came to a stop. Accordingly, the evidence is sufficient to support a finding that Appellant failed to immediately stop his vehicle at the scene of the accident or as close to the scene as possible.

Having determined the evidence is sufficient to support the FSRA elements Appellant challenges on appeal, we overrule his sole issue.

## Conclusion

We affirm the trial court's judgment.

Andrew Johnson
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Johnson.

Do not publish. TEX. R. APP. P. 47.2(b).